198 N.J. Super. 132 (1984)
486 A.2d 888
IN RE GUARDIANSHIP SERVICES REGULATIONS.
Superior Court of New Jersey, Appellate Division.
Argued December 4, 1984.
Decided December 31, 1984.
*135 Before Judges MICHELS, PETRELLA and BAIME.
Linda J. Robinson, Assistant Deputy Public Advocate argued the cause for appellant, Joseph H. Rodriguez, Public Advocate, New Jersey Department of Public Advocate (Joseph H. Rodriguez, Public Advocate, attorney; Herbert D. Hinkle, Director, Division of Advocacy for the Developmentally Disabled and Linda J. Robinson, on the brief).
Susan R. Oxford, Deputy Attorney General, argued the cause for respondent New Jersey Department of Human Services, Division of Mental Retardation (James J. Ciancia, Assistant Attorney General, of counsel, Susan R. Oxford, on the brief).
The opinion of the Court was delivered by MICHELS, P.J.A.D.
*136 Joseph H. Rodriguez, Public Advocate, New Jersey Department of the Public Advocate (Public Advocate) challenges the validity of guardianship services regulations N.J.A.C. 10:45-1.3(b), (d) and N.J.A.C. 10:45-1.4(b) promulgated by the Department of Human Services (Department), Division of Mental Retardation (Division). These regulations provide guidelines for extending guardianship services to children receiving functional services from the Division who are orphaned, abandoned, or otherwise without a legal guardian. The regulations under attack read as follows:
10:45-1.3 Eligibility
* * * * * * * *
(b) To be eligible for guardianship services, a mentally retarded minor must:
1. Be receiving functional services from the Division of Mental Retardation;
2. Be orphaned or abandoned and have no legally appointed guardian. Such status shall be verified by either;
i. Documentation that the child's legal guardian(s) is (are) deceased or;
ii. Documentation that the following efforts to locate the child's guardian have been unsuccessful:
(A) Notice by regular mail and follow-up by certified mail, return receipt requested, to the guardian's last known address, with no response received within 45 days;
(B) Discrete inquiry among any known relations, friends and current or former employers of the parent(s); and
(C) Direct inquiries, unless otherwise restricted by law, using the guardian's name and last known or suspected address, to the local post office, the Division of Motor Vehicles and any social service and law enforcement agencies known to have had contact with the guardian(s) both in New Jersey and other states. Failure to receive a response to the inquiries within 45 days shall constitute a negative response.
* * * * * * * *
(d) Eligibility for a child continues as long as he or she:
i. Is receiving functional services;
ii. Is under the age of 18 years, and;
iii. Has no available legal guardian of the person. In any instance when a parent or legally appointed guardian, who had been previously inaccessible, again becomes available to exercise their role, guardianship services shall immediately and automatically cease.

*137 (e) Prior to reaching the age of majority, a determination must be made regarding the issue of mental deficiency and the continuing need for guardianship services as an adult (N.J.S.A. 30:4-165.6; N.J.A.C. 10:43). 10:45-1.4 Provision of guardianship
* * * * * * * *
(b) When a client is under 18 years of age and has met the eligibility criteria above (N.J.A.C. 10:45-1.3(b), the Bureau of Guardianship Services shall provide guardianship of the person services.

I.
The Public Advocate challenges these regulations on equal protection and due process grounds and asserts that they are ultra vires. The standard of judicial review of regulations promulgated by an administrative agency such as the Department are thoroughly discussed and clearly stated in New Jersey Guild of Hearing Aid Dispensers v. Long, 75 N.J. 544, 560-563 (1978). The Supreme Court there emphasized that the powers of an administrative agency should be liberally construed to permit the agency to achieve the task assigned to it and that the administrative agency has such implied incidental powers as may be reasonably adopted to that end. See New Jersey Guild of Hearing Aid Dispensers, supra, 75 N.J. at 562; In re Suspension of Heller, 73 N.J. 292, 303 (1977); State v. Dolce, 178 N.J. Super. 275, 286 (App.Div. 1981). Application of these principles to the Public Advocate's challenge to the regulations on ultra vires grounds compels the conclusion that the regulations under attack do not exceed the scope of the broad delegation of power to the Department and its Commissioner, and are not arbitrary, capricious or unreasonable. See Bergen Pines Hosp. v. Dept. of Human Serv., 96 N.J. 456, 477 (1984); N.J. Ass'n of Health Care Facilities v. Finley, 83 N.J. 67, 79 (1980), appeal dismissed, 449 U.S. 944, 101 S.Ct. 342, 66 L.Ed.2d 208 (1980); Newark v. Natural Resource Coun. Dept. Env. Prot., 82 N.J. 530, 539-540 (1980), cert. den. 449 U.S. 983, 101 S.Ct. 400, 66 L.Ed.2d 245 (1980). These regulations are part of regulatory guidelines designed to assure that guardianship services will be extended to mentally deficient minors who *138 during the time they are receiving "functional services" from the Division become orphaned, abandoned or otherwise are determined to be without a parent or guardian.
The Legislature has delegated broad powers to the Commissioner to promulgate rules and regulations aimed at implementing the policies and statutory duties of his department. These include regulations intended to "establish and maintain specialized facilities and services for the residential care, treatment, and rehabilitation of persons who are suffering from chronic mental or neurological disorders...." N.J.S.A. 30:1-12. Indeed, pursuant to N.J.S.A. 30:4-25.7, the Legislature has mandated that:
The commissioner shall make all reasonable and necessary provisions to ensure the health, safety, welfare and earliest appropriate release of persons admitted to residential services for the mentally retarded. He shall provide further for educational, medical, dietetic, and social needs of any such person in accordance with such person's individual requirements, as determined by competent professional personnel.
Moreover, pursuant to N.J.S.A. 30:4-165.1, the Legislature has also directed the Department to provide mentally retarded persons with comprehensive evaluation, functional and guardianship services. This provision of the Act reads:
The department shall provide comprehensive evaluation, functional and guardianship services, as hereafter designated, in order that eligible mentally retarded persons may be provided with adequate training, care and protection.
Evaluation services shall include:
(1) primary evaluation services consisting of inpatient and outpatient facilities for the direct evaluation of medical, psychological, social, educational and related factors affecting the functioning of the individual and pertinent to his need for specialized care, training or treatment as a mentally retarded person; and
(2) secondary evaluation services consisting of facilities for the appraisal of such data available from other sources.
"Functional services," referred to in N.J.S.A. 30:4-165.1, include both residential and nonresidential services, as appears from N.J.S.A. 30:4-165.2:
Functional services for the mentally retarded shall include both residential and nonresidential services as follows:
(1) Nonresidential functional services shall include but need not be limited to: evaluation, counseling of family or guardian, of employer, or of retarded *139 person; consultative services to social, educational, or welfare and health agencies and to the courts; day-care programs; and day training programs.
(2) Residential functional services shall include but need not be limited to: evaluation study, treatment, education, training, rehabilitation, care and protection provided in State schools and in other residential facilities operated by the department; interim placement in approved residential facilities other than State schools. Such programs may be of short- or long-term duration as required.
For a minor to become eligible for "functional services," his or her parent or guardian, an agency, hospital, or physician providing services to the minor (with the written consent of the parent or guardian or the Division of Youth and Family Services (DYFS), or a juvenile court must apply to the Division pursuant to N.J.S.A. 30:4-25.2. In cases wherein an agency, hospital or physician makes application for services, the Commissioner has, by regulation, broadly interpreted the need for "written consent of the parent or guardian." That regulation provides that "[i]f the parent or guardian is not available, then anyone providing care and custody of the child may sign the application for determination of eligibility." N.J.A.C. 10:46-4.2.
"Guardianship services for the mentally retarded" are more narrowly defined. N.J.S.A. 30:4-165.4 provides:
"Guardianship services for the mentally retarded" shall mean those services and programs provided by the Division of Mental Retardation for the purpose of implementing its responsibility toward the mentally retarded individual, for whom it is performing the services of guardian of the person.
The Division's mandate to provide "guardianship services for the mentally retarded" includes performing the "services of guardian of the person." However, the Division's authorizing statute only provides for the Division's appointment as guardian of mentally retarded persons over age 21. That provision, N.J.S.A. 30:4-165.5, states:
Whenever a mentally retarded minor has been admitted to functional services provided by the department on application of the parent or guardian as provided herein and has not been discharged therefrom, the commissioner shall, not less than 6 months nor more than 3 years prior to the twenty-first birthday of said mentally retarded person, cause him to be examined to ascertain whether it appears that such person is mentally deficient.
If the commissioner anticipates that such person will, by reason of mental deficiency, continue to require protection and supervision on his own interest, *140 being incapable of managing himself and his affairs on the attainment of his majority, the commissioner or his designated agent shall inquire as to the intentions of the parent or guardian or said minor with respect to instituting proceedings for appointment of a guardian.
In the event that no guardian has been appointed when the minor has attained age 21, and if the commissioner has ascertained that such person is mentally deficient as provided above, then the Division of Mental Retardation within the department shall perform such services for the mentally deficient adult, as he may require, and which otherwise would be rendered by a guardian of his person.
The only exception arises in cases wherein a juvenile court adjudges a mentally retarded minor neglected or delinquent. In those instances the juvenile court may accompany its application for admission of the minor to functional services with an order placing the minor under the Commissioner's care and custody.
The Division therefore seeks in the regulations under review to extend its statutory authority to provide "guardianship services of the person" to those limited situations wherein a mentally retarded minor's parent(s) suddenly die, abandon the minor, or otherwise become unavailable during the period the minor is receiving Division "functional services." N.J.A.C. 10:45-1.3. These regulations enable the Division to initiate guardianship services without first having to involve either the juvenile court or DYFS and are implicit in the broad grant of power to the Commissioner to provide "comprehensive evaluation, functional and guardianship services" to eligible mentally retarded persons. N.J.S.A. 30:4-165.1. The challenged regulations are plainly needed if the Division is to fulfill its statutory responsibility.
Furthermore, contrary to the Public Advocate's claim, these regulations do not amount to a termination of parental rights. Rather, "when a client is under 18 years of age and has met the eligibility criteria [of N.J.A.C. 10:45-1.3(b)] ... the Bureau of Guardianship Services shall provide guardianship of the person services" until the parent or guardian becomes available. N.J.A.C. 10:45-1.4(b); 10:45-1.3(d)(iii). Thus, the regulations enable the Division to utilize its expertise in caring for mentally *141 retarded persons by providing comprehensive guardianship services to minors already clients and receiving services of the Division.
This regulatory scheme fully comports with the State's strong commitment to providing care for the mentally handicapped. See N.J. Ass'n for Retarded Citizens v. Human Services, 89 N.J. 234, 252 (1982); Levine v. Institutions and Agencies Dept. of N.J., 84 N.J. 234, 249 (1980); D.S. v. East Brunswick Tp. Bd. of Ed., 188 N.J. Super. 592, 609 (1983), certif. den. 94 N.J. 529 (1983). As the Supreme Court emphasized in N.J. Ass'n for Retarded Citizens v. Human Services, supra:
We have previously recognized the Legislature's strong moral and legal commitment to care for the handicapped. Levine v. Department of Institutions and Agencies of New Jersey, 84 N.J. 234, 249 (1980). It has not only enacted a bill of rights for the developmentally disabled, N.J.S.A. 30:6D-1 to 12, but has vigorously sought to improve the services offered to the mentally handicapped. The record in this case demonstrates that the Departments of Education and Human Services are sincerely attempting to carry out their statutory mandates. State services for residents at Hunterdon have improved dramatically in recent years. Indications are that they will continue to improve. The State deserves great credit for its diligent efforts.
* * * * * * * *
The services offered to mentally retarded citizens should be provided in a spirit of optimism. The Legislature has declared it the policy of this State to maximize the developmental potential of these citizens while affording them the maximum feasible personal liberty. Like all other citizens, the mentally retarded have the right to pursue happiness. Unlike other citizens, they have unique hurdles to overcome in doing so. Rather than exclude them from the pursuit of happiness, the Legislature has made an effort to include them in our civic community by providing them the special services they need to develop and grow. This public policy affirms our common humanity. Their concerns are our concerns. In this State, we do not set people adrift because they are the victims of misfortune. We take care of each other. [89 N.J. at 249, 252; see D.S., supra, 188 N.J. Super. at 609].
We hold therefore that the regulations at issue are not ultra vires but rather comport with public policy and the Legislature's mandate. On similar grounds we reject the Public Advocate's arguments with regard to the scope of the guardianship services the Division may provide.

*142 II.
The Public Advocate's primary constitutional challenge is that the provisions of N.J.A.C. 10:45-1.1 et seq. deny "mentally retarded minors" and their parents due process by interfering with parental rights without a hearing or adjudication. The Public Advocate specifically objects to the provisions of N.J.A.C. 10:45-1.3 and 10:45-1.4, quoted above, which define the standards for finding a "mentally retarded minor" eligible for the Division's guardianship services. The Public Advocate argues essentially that due process requires judicial consideration of the child's best interests under any statutory or regulatory scheme which threatens to interfere with a parent's right to the care and custody of his or her child.
We emphasize that, contrary to the Public Advocate's assertions, the challenged regulations neither enable the Division to appoint itself legal guardian for a mentally retarded minor nor to terminate parental rights. Rather, they merely enable the Division to provide services as guardian of the person to a mentally retarded minor upon a determination that the minor's parent[s] or guardian[s] have passed away, abandoned the minor, or otherwise become unavailable. Stated differently, the regulations simply insure that guardianship services will be extended to those minors presently receiving functional services when they become orphaned, abandoned or without legal representation. These guardianship services, however, immediately cease once the minor's parent[s] or guardian[s] again become available. N.J.A.C. 10:45-1.3(d)(iii). In this respect, the Attorney General emphasized that the Division intends its guardianship services to be temporary, filling the "gap in guardianship created by a missing or deceased parent ... pending location of the natural parent or appointment of some other interested individual to be the child's legal guardian." Additionally, the regulations provide that guardianship services include guardianship of the person, not property, and that where consent is required for shock treatment, psychosurgery, sterilization, or medical, behavioral, or pharmacological research, *143 the Division must obtain appointment of a guardian ad litem. N.J.A.C. 10:45-1.6. Cf. N.J.S.A. 30:4C-2 (defining "guardianship" for purposes of services provided by DYFS).
In assessing the constitutionality of these regulations, we note that the grant of authority to an administrative agency engaged in protecting the health and welfare of the public is to be liberally construed in order to enable the agency to accomplish its statutory responsibilities and that the courts should readily imply such incidental powers as are necessary to effectuate fully the legislative purpose. New Jersey Guild of Hearing Aid Dispensers, supra, 75 N.J. at 562. See also In re Suspension of Heller, supra, 73 N.J. at 303-304, 374 A.2d 1191; In re Marvin Gastman, 147 N.J. Super. 101, 110 (App. Div. 1977). Where an administrative action is statutorily authorized and is neither arbitrary, capricious nor unreasonable, the reviewing court should not attempt to substitute its judgment for that of the administrative agency, especially in a case, such as this, requiring the exercise of the agency's expertise in providing services for the mentally retarded. See New Jersey Guild of Hearing Aid Dispensers, supra, 75 N.J. at 562-563; Mayflower Securities v. Bureau of Securities, 64 N.J. 85, 92-93 (1973).
We recognize, of course, that a governmental body may not deprive an individual of a liberty or property interest without first conforming with the requirements of procedural due process. See Mathews v. Eldridge, 424 U.S. 319, 332-335, 96 S.Ct. 893, 901-903, 47 L.Ed. 18 (1976); Morrissey v. Brewer, 408 U.S. 471, 481, 92 S.Ct. 2593, 2600, 33 L.Ed.2d 484 (1972); State in the Interest of D.G.W., 70 N.J. 488 (1976). The United States Supreme Court has historically recognized "that freedom of personal choice in matters of family life is a fundamental liberty interest protected by the Fourteenth Amendment." Santosky v. Kramer, 455 U.S. 745, 753, 102 S.Ct. 1388, 1394, 71 L.Ed.2d 599 (1982). See, e.g., Stanley v. Illinois, 405 U.S. 645, 651-652, 92 S.Ct. 1208, 1212-13, 31 L.Ed.2d 551 (1972); *144 Pierce v. Society of Sisters, 268 U.S. 510, 534-535, 45 S.Ct. 571, 573, 69 L.Ed. 1070 (1925); Meyer v. Nebraska, 262 U.S. 390, 399, 43 S.Ct. 625, 626, 67 L.Ed. 1042 (1923). Parents have a fundamental liberty interest in the care, custody and management of their children. Santosky, supra, 455 U.S. 745 at 753, 102 S.Ct. 1388 at 1394, 71 L.Ed.2d 599. As the Supreme Court has said:
The Court has frequently emphasized the importance of the family. The rights to conceive and to raise one's children have been deemed "essential," Meyer v. Nebraska, 262 U.S. 390, 399, 67 L.Ed. 1042, 1045, 43 S.Ct. 625 [626], 29 ALR 1446 (1923), "basic civil rights of man," Skinner v. Oklahoma, 316 U.S. 535, 541, 86 L.Ed. 1655, 1660, 62 S.Ct. 1110 [1113] (1942), and "[r]ights far more precious ... than property rights," May v. Anderson, 345 U.S. 528, 533, 97 L.Ed. 1221, 1226, 73 S.Ct. 840 (1953). "It is cardinal with us that the custody, care and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligations the state can neither supply nor hinder." Prince v. Massachusetts, 321 U.S. 158, 166, 88 L.Ed. 645, 652, 64 S.Ct. 438 [442] (1944). The integrity of the family unit has found protection in the Due Process Clause of the Fourteenth Amendment, Meyer v. Nebraska, supra [262 U.S.], at 399, 67 L.Ed. at 1045 [43 S.Ct. at 626], the Equal Protection Clause of the Fourteenth Amendment, Skinner v. Oklahoma, supra [316 U.S.] at 541, 86 L.Ed. at 1660 [62 S.Ct. at 1113], and the Ninth Amendment, Griswold v. Connecticut, 381 U.S. 479, 496, 14 L.Ed.2d 510, 522, 85 S.Ct. 1678 [1688] (1965) (Goldberg, J., concurring). [Stanley, supra, 405 U.S. 645 at 651; 92 S.Ct. 1208 at 1212-13, 31 L.Ed. 551].
New Jersey's courts have also expressed their profound respect for the ties that bind a parent or legal guardian and the child. E.E.B. v. D.A., 89 N.J. 595 (1982), cert. den. 459 U.S. 1210, 103 S.Ct. 1203, 75 L.Ed.2d 445 (1983), reh'g den., 460 U.S. 1104, 103 S.Ct. 1806, 76 L.Ed.2d 369 (1983); Sorentino v. Family and Children's Soc. of Elizabeth, 74 N.J. 313, 322-324 (1977). New Jersey recognizes that a parent's interest in the "companionship, care, custody and management" of their children deserves special protection. In re Guardianship of Dotson, 72 N.J. 112, 122 (1976) (Pashman, J., concurring). See State v. Perricone, 37 N.J. 463, 472 (1962), cert. den. 371 U.S. 890, 83 S.Ct. 189, 9 L.Ed.2d 124 (1962); Lavigne v. Family and Children's Soc. of Elizabeth, 11 N.J. 473, 479-480, 95 A.2d 6 (1953).
*145 However, we cannot emphasize too strongly that these regulations do not terminate parental rights nor do they otherwise tread on the legal rights of parents to control and care for the custody of their children. Therefore, they do not offend the parent's or guardian's fundamental rights.
Moreover, we are satisfied that the procedures adopted by the Department pass constitutional muster. The requirements of due process are flexible and call for such procedural protections as the particular situation demands. Morrissey v. Brewer, supra, 408 U.S. 471 at 481, 92 S.Ct. 2593, at 2600, 33 L.Ed.2d 484; D.G.W., supra, 70 N.J. at 502. At minimum, due process requires notice and an opportunity to be heard, Fuentes v. Shevin, 407 U.S. 67, 79, 92 S.Ct. 1983, 1993, 32 L.Ed.2d 556 (1972) reh. den. 409 U.S. 902, 93 S.Ct. 177, 34 L.Ed.2d 165 (1972), but the Supreme Court has established that due process does not require a hearing in every instance. Stanley v. Illinois, supra, 405 U.S. 645 at 650, 92 S.Ct. 1208, at 1212, 31 L.Ed.2d 551. Accordingly, in Mathews v. Eldridge, supra, the Supreme Court stated:
[R]esolution of the issue whether the administrative procedures provided here are constitutionally sufficient requires analysis of the governmental and private interests that are affected. Arnett v. Kennedy, supra [416 U.S. 134], at 167-168, 40 L.Ed.2d 15, 94 S.Ct. 1633 [at 1650-51] (Powell, J., concurring in part); Goldberg v. Kelly, supra [397 U.S. 254], at 263-266, 25 L.Ed.2d 287, 90 S.Ct. 1011 [at 1018-19]; Cafeteria Workers v. McElroy, supra [367 U.S. 886], at 895, 6 L.Ed.2d 1230, 81 S.Ct. 1743 [at 1748]. More precisely, our prior decisions indicate that identification of the specific dictates of due process generally requires consideration of three distinct factors: first, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail. See, e.g., Goldberg v. Kelly, supra [397 U.S. 254] at 263-271, 25 L.Ed.2d 287, 90 S.Ct. 1011 [at 1018-22]. [424 U.S. 319 at 334-335, 96 S.Ct. 893 at 902-03, 47 L.Ed.2d 18].
Mathews therefore specifies a weighing of three distinct factors: (1) the private interest affected by the proceedings, (2) the risk of error created by the State's chosen procedure and (3) the *146 countervailing governmental interest satisfied by utilizing the challenged administrative procedure.
The private interests here are twofold: first, those of the parent in exercising parental prerogatives, that is, care, custody and management of the child, and secondly, those of both the parent and child in their continuing uninterrupted parent/child relationship. Both interests are for the most part fictional in the circumstances addressed by these regulations since the parent or guardian is either deceased or has abandoned the child or cannot be located and therefore has not actually been exercising any parental prerogatives. The risk of error in the State's chosen procedure is also minimal since it provides for notice by both regular and certified mail as well as inquiries into a number of specified public and private sources. Most importantly, at any point in which the parent or legal guardian becomes available to exercise their role, guardianship services immediately and automatically cease. See N.J.A.C. 10:45-1.3(d)(iii).
The countervailing government interest on the other hand is extremely important since the interest of mentally retarded minors within the Division's custody are best served when the gap in guardianship created by a missing or deceased parent is temporarily filled by the Division, pending location of the natural parent or the appointment of some other interested individual to be the child's legal guardian. This procedure also aids the Division in fulfilling its statutory mandate to take reasonable steps to see that minors in its custody receive appropriate medical, educational and clinical care. N.J.S.A. 30:4-7.1, 30:4-7.2, 30:4-7.4, 30:4-25.7, and 30:1-12. See also N.J. Ass'n for Retarded Citizens v. Human Services, supra, 89 N.J. at 243-247, 249-252.
Additionally, a prerequisite to the Division's invoking its guardianship powers is that the minor already be receiving Division functional services. See N.J.A.C. 10:45-1.3(b)(1). In most cases, the minor will have been admitted into these *147 services either with parental consent or by court order. In this regard, counsel informed us at oral argument that of the 1,637 children receiving functional services, only 14 of the children have been orphaned, abandoned, or otherwise without legal representation and that of these 14, the parents of 4 of the children have expressly abandoned them. Thus, in the larger percentage of cases, the parent or guardian will have consented already to the Division personnel taking significant responsibility for the minor's day-to-day well-being.
Finally, on balance the regulations clearly serve the best interest of the child. The regulatory guidelines benefit the child by insuring that, 45 days after the Division commences the search for a parent or guardian, there is an entity empowered to take responsibility for the child's welfare, contingent on the reappearance of the parent or the location and appointment of a legal guardian. These regulations merely (a) articulate the procedures to be followed by Division personnel in ascertaining that the minor lacks a parent or guardian and (b) authorize the Division to assume responsibility for the minor, pending more permanent measures, rather than immediately taking the more time-consuming and administratively complex step of referring the case to DYFS.
The Public Advocate argues that 45 days is too short a period and does not allow parents to absent themselves during an extended vacation or business trip. However, this ignores the reality of the situation of these children. If parents absent themselves without maintaining contact with the facility housing their mentally retarded children for such extended periods and have not notified the facility or others in authority of their intent to be away, they undoubtedly have little, if any, interest in maintaining a close relationship with their children. More importantly, in such circumstances the child's best interests are served by having available a responsible legal entity authorized to make guardianship decisions on his or her behalf. The parents, by thus ignoring, relinquishing or virtually abandoning their responsibility, should not later complain that the Division *148 acted irresponsibly. In any case, once the parents return, the guardianship services immediately cease. N.J.A.C. 10:45-1.3(d)(iii).
Second, the Public Advocate worries that relatives or parents who do not speak English will not understand the significance of the Division's inquiries. Presumably, in cases involving non-English speaking relatives the Division will make contact in the relative's language. In the alternative, the return of the "return receipt" notice on the certified letter should notify the Division that the parent[s] or relative[s] exist and the Division will thereupon follow-up.
The incremental benefit of the hearing urged by the Public Advocate is minimal and is substantially outweighed by the social utility of the present scheme, thereby satisfying the third prong of Mathews. In those cases in which the Division locates the parents, no hearing is necessary because obviously there would be no need for the Division to invoke its guardianship authority. The purpose of a hearing would, at most, be to obtain a judicial or formal administrative determination that in cases in which the Division failed to locate a mentally retarded minor's parent[s] or guardian[s], the Division had made a diligent search consistent with its procedures. However, the regulations provide substantial opportunity for notice to absent parents, and any parent being sought need merely contact the Division to cut-off the Division's right under the regulations to provide guardianship of the person services. Imposing the hearing sought by the Public Advocate would unduly burden the Division by delaying the process of invoking the Division's guardianship responsibilities and, by requiring additional court appearances and preparation, imposing further unnecessary economic burdens upon the State.
After balancing the relevant private and State interests and weighing the reliability of the regulation's procedures, we are satisfied that where the Division seeks to provide temporary guardianship services to an orphaned or abandoned mentally *149 retarded minor already receiving its services, the procedural safeguards contained in the regulations satisfy the requirements of due process. No hearing is required, and the regulations provide parents with adequate notice and opportunity to be heard before the Division intervenes.

III.
The Public Advocate finally contends that the regulations violate the right of mentally retarded minors to equal protection by treating such minors "differently than all other children in New Jersey for the purpose of appointment of a guardian." Specifically, the Public Advocate claims that the Division "is the only state agency known to [it] which attempts to circumvent the procedures for judicial review contained in N.J.S.A. 30:4C-15 et seq." and that such discriminatory treatment violates the Equal Protection Clauses of the United States and New Jersey constitutions, Section 504 of the Federal Rehabilitation Act, 29 U.S.C.A. § 794, and the New Jersey Developmentally Disabled Rights Act, N.J.S.A. 30:6D-1 et seq. We disagree.
"The equal protection of the laws means that no person or class of persons shall be denied the protection of the laws enjoyed by other persons or classes of persons under similar conditions and circumstances, in their lives, liberty, and property, and in the pursuit of happiness, both as respects privileges conferred and burdens imposed." Levine v. Institutions & Agencies Dept. of N.J., supra, 84 N.J. at 256, quoting from Washington National Ins. Co. v. Board of Review, 1 N.J. 545, 553 (1949). Stated differently, constitutional principles of equal protection do not require that all persons be treated identically. They require only that any differences in treatment be justified by an appropriate state interest. The state need only show a rationale basis for its classification where, as here, the classification is not suspect. Domenick v. Taxation Div. Director, 176 N.J. Super. 121, 128 (App.Div. 1980). As the *150 United States Supreme Court stated in Parham v. Hughes, 141 U.S. 347, 99 S.Ct. 1742, 60 L.Ed.2d 269 (1979):
State laws are generally entitled to a presumption of validity against attack under the Equal Protection Clause. Lockport v. Citizens for Community Action, 430 U.S. 259, 272, 51 L.Ed.2d 313, 97 S.Ct. 1047 [1055]. Legislatures have wide discretion in passing laws that have the inevitable effect of treating some people differently from others, and legislative classifications are valid unless they bear no rational relationship to a permissible state objective. New York City Transit Authority v. Beazer, 440 U.S. 568, 59 L.Ed.2d 587, 99 S.Ct. 1355; Vance v. Bradley, 440 U.S. 93, 59 L.Ed.2d 171, 99 S.Ct. 939; Massachusetts Bd. of Retirement v. Murgia, 427 U.S. 307, 314, 49 L.Ed.2d 520, 96 S.Ct. 2562 [2567]; Dandridge v. Williams, 397 U.S. 471, 485, 25 L.Ed.2d 491, 90 S.Ct. 1153 [1161].
Not all legislation, however, is entitled to the same presumption of validity. The presumption is not present when a State has enacted legislation whose purpose or effect is to create classes based upon racial criteria, since racial classifications, in a constitutional sense, are inherently "suspect." McLaughlin v. Florida, 379 U.S. 184, 13 L.Ed.2d 222, 85 S.Ct. 283; Brown v. Board of Education, 347 U.S. 483, 98 L.Ed. 873, 74 S.Ct. 686, 53 Ohio Ops 326, 38 ALR 2d 1180. And the presumption of statutory validity may also be undermined when a State has enacted legislation creating classes based upon certain other immutable human attributes. See, e.g., Oyama v. California, 332 U.S. 633, 92 L.Ed. 249, 68 S.Ct. 269 (national origin); Graham v. Richardson, 403 U.S. 365, 29 L.Ed.2d 534, 91 S.Ct. 1848 (alienage); Gomez v. Perez, 409 U.S. 535, 35 L.Ed.2d 56, 93 S.Ct. 872 (illegitimacy); Reed v. Reed, 404 U.S. 71, 30 L.Ed.2d 225, 92 S.Ct. 251 (gender).
In the absence of invidious discrimination, however, a court is not free under the aegis of the Equal Protection Clause to substitute its judgment for the will of the people of a State as expressed in the laws passed by their popularly elected legislatures. "The Constitution presumes that, absent some reason to infer antipathy, even improvident decisions will eventually be rectified by the democractic process and that judicial intervention is generally unwarranted no matter how unwisely we may think a political branch has acted." Vance v. Bradley, 440 U.S. [93] at 97, 59 L.Ed.2d 171, 99 S.Ct. 939 [at 942-43] (footnote omitted). [441 U.S. 347 at 351, 99 S.Ct. 1742, at 1745-46, 60 L.Ed.2d 269].
See also San Antonio Indep. School Dist. v. Rodriguez, 411 U.S. 1, 16, 93 S.Ct. 1278, 36 L.Ed.2d 16, reh. den., 411 U.S. 959, 93 S.Ct. 1919, 36 L.Ed.2d 418 (1973); State v. Fearick, 69 N.J. 32, 40 (1976); Trantino v. Department of Corrections, 168 N.J. Super. 220, 227-228 (App.Div. 1979) certif. den. 81 N.J. 338 (1979).
In our view there is no discriminatory treatment or violation of equal rights here. A rational basis exists for the *151 distinction between the procedures applied to mentally deficient children who after commencing functional services with the Division are found to have been abandoned or orphaned or whose parents have otherwise become unavailable and other children who may be entitled to a hearing before a guardian can be appointed for them. We must not lose sight of the fact that the regulations under attack only provide that a child who satisfies the specified criteria becomes eligible for the Division's guardianship of the person services. This is entirely different from the guardianship provided in the usual situation or where guardianship is sought for minors in the custody of DYFS. DYFS primarily responds to situations in which the State and the natural parents occupy adversarial positions. The Division, on the other hand, gains custody as pointed out above, only in the process of providing functional services to the mentally deficient child. Thus, it does not occupy a position adverse to that of the parents and has no interest in terminating parental rights.
As a matter of fact, the nature of the guardianship created by N.J.A.C. 10:45:101 et seq. is entirely different from the guardianship for purposes of the DYFS provisions. See N.J.S.A. 30:4C-2(e). The regulations specifically provide for the guardianship services staff to limit its role to guardianship of the person, not property, and that a guardian ad litem shall be specifically appointed by a court for the purpose of consenting to shock treatment, psychotherapy, sterilization or medical, behavioral, or pharmacological research. See N.J.A.C. 10:45-1.6. Moreover, we cannot emphasize too strongly that the regulations obligate the Division to cease immediately from providing "guardianship services" when the parent[s] or guardian[s] again become available to exercise their parental role.
In contrast, the guardianship for purposes of DYFS provisions is defined more broadly in N.J.S.A. 30:4C-2(e). This definition of guardianship contains none of the limitations present in the regulations under attack and includes guardianship of property as well as of the person. Indeed, the statutory *152 definition appears to define a legal status whereas the regulations merely describe a specialized form of continued public welfare service. Consequently, minors under legal guardianship and minors receiving guardianship services for the mentally retarded as provided by the regulations fall within separate classifications warranting disparate treatment under the state and federal equal protection clauses. We have no hesitancy in concluding that the Public Advocate has failed to meet his burden of demonstrating that the classification lacked any rational basis or legitimate state purpose.
Finally, the Public Advocate's claims that the regulations violate Section 504 of the Federal Rehabilitation Act, 29 U.S.C.A. 794, and the New Jersey Developmentally Disabled Rights Act, N.J.S.A. 30:6D-1 et seq. are clearly without merit.
Accordingly, the regulations under review are sustained.