693 A.2d 133

IN RE CERTIFICATE OF NEED GRANTED
TO THE HARBORAGE.

Superior Court of New Jersey
Appellate Division

Argued  March 25, 1997—Decided May 2, 1997.

---

364

Before Judges MICHELS, MUIR, Jr., and COBURN.

*Joseph D. Glazer* argued the cause for appellant Bergen Pines County Hospital (*Reed, Smith, Shaw & McClay*, attorneys; *Murray J. Klein*, of counsel; *Robert B. Kinz, Karen L. Palestini*, and *Mr. Glazer*, on the brief).

*Mary F. Rubenstein*, Deputy Attorney General, argued the cause for respondent Deputy Commissioner of the Department of Health and Senior Services (*Peter Verniero*, Attorney General of

New Jersey, attorney; *Mary C. Jacobson*, Assistant Attorney General, of counsel; *Ms. Rubenstein* on the brief).

*Sharlene A. Hunt* argued the cause for respondent The Harborage (*Giordano, Halleran & Ciesla*, attorneys; *Ms. Hunt*, of counsel; *Michele Shoueka*, on the brief).

The opinion of the Court was delivered by

MICHELS, P.J.A.D.

Appellant Bergen Pines County Hospital (Bergen Pines) appeals from a final administrative action of respondent Deputy Commissioner of the Department of Health and Senior Services of the State of New Jersey[1] that awarded a Certificate of Need (CON) to respondent The Harborage for the establishment of a thirteen long-term ventilator care bed unit at its facility in North Bergen, Hudson County, New Jersey, and denied Bergen Pines' CON application for a similar thirteen-bed unit at its facility in Paramus, New Jersey.

## I.

### REGULATORY BACKGROUND

Pursuant to the Health Care Facilities Planning Act, *N.J.S.A.* 26:2H–1 *et seq.* (the Act), and specifically *N.J.S.A.* 26:2H–7, no health care facility, including a hospital, may construct new facilities or expand an existing one or initiate a new health care service, unless a CON has been applied for by the facility and been granted by the State Commissioner of Health (Commissioner). *See also N.J.A.C.* 8:33–3.1.[2] The award of the CON is governed by *N.J.S.A.* 26:2H–8, which, in pertinent part, provides:

---

[1] Pursuant to Reorganization Plan No. 001–1996, the Department of Health was redesignated as the Department of Health and Senior Services. 28 *N.J.R.* 2655(a) (June 3, 1996).

[2] Several sections of the New Jersey Administrative Code referred to in this opinion were amended. *See* 25 *N.J.R.* 6031(a) (December 20, 1993); 28 *N.J.R.*

> No certificate of need shall be issued unless the action proposed in the application for such certificate is necessary to provide required health care in the area to be served, can be economically accomplished and maintained, will not have an adverse economic or financial impact on the delivery of health care services in the region or Statewide, and will contribute to the orderly development of adequate and effective health care services. In making such determinations there shall be taken into consideration (a) the availability of facilities or services which may serve as alternatives or substitutes, (b) the need for special equipment and services in the area, (c) the possible economies and improvement in services to be anticipated from the operation of joint central services, (d) the adequacy of financial resources and sources of present and future revenues, (e) the availability of sufficient manpower in the several professional disciplines, and (f) such other factors as may be established by regulation. The State Health Plan may also be considered in determining whether to approve a certificate of need application.

CON applications are submitted to the State Department of Health and Senior Services (Department) for its consideration. *N.J.S.A.* 26:2H–10. However, an application to provide a particular health care service cannot be submitted until the Department issues a "call," in the *New Jersey Register,* inviting the submission of CON applications for that specific service. *N.J.A.C.* 8:33–4.1(a) and (b). Once a call is issued and a CON application received, the Department determines if the application is complete and meets specific criteria. *N.J.A.C.* 8:33–4.5; *N.J.A.C.* 8:33–4.9; *N.J.A.C.* 8:33–4.10. Once deemed complete, the application is forwarded for review to the Local Advisory Board (LAB) with jurisdiction over the geographic area in which the applicant is located. *N.J.S.A.* 26:2H–5.9b; *N.J.S.A.* 26:2H–10; *N.J.A.C.* 8:33–4.1; *N.J.A.C.* 8:33–4.12. The LAB is authorized to review, in light of applicable health planning regulations, CON applications for any proposed project in its geographic region and to make recommendations regarding those applications to the Commissioner. *N.J.S.A.* 26:2H–5.9b; *N.J.A.C.* 8:33–4.12(b).

Health planning regulations pertinent to this appeal, which involves the provision for adult ventilator beds, a specialized form of long-term care service, *N.J.A.C.* 8:33H–1.7(a)1, are codified at *N.J.A.C.* 8:33H–1.1 to *N.J.A.C.* 8:33H–1.20 of the New Jersey

---

1228(a) (February 20, 1996). However, these amendments do not have any effect on our decision.

Administrative Code. If twenty-five percent or more of the quorum of voting members of a LAB vote to approve an application, regardless of whether the LAB's overall recommendation is to approve or deny the application, it is forwarded to the State Health Planning Board (SHPB), which was established within the Department by *N.J.S.A.* 26:2H–5.7, for review. *N.J.S.A.* 26:2H–10.1a(1); *N.J.A.C.* 8:33–4.1; *N.J.A.C.* 8:33–4.14(a). If twenty-five percent of a quorum of voting members at the SHPB vote to approve the application, the application is forwarded to the Commissioner for consideration, regardless of whether the SHPB's overall recommendation is to deny or approve the application. If less than twenty-five percent approve the application, it is not submitted to the Commissioner. *N.J.S.A.* 26:2H–10.1a(2); *N.J.A.C.* 8:33–4.14(b).

An applicant whose application is denied by the SHPB may seek a hearing conducted by the Office of Administrative Law (OAL). *N.J.S.A.* 26:2H–10.1b; *N.J.A.C.* 8:33–4.14(c). If the Administrative Law Judge (ALJ) decides that the application was wrongly denied by the SHPB, the application proceeds to the Commissioner for final review. *N.J.A.C.* 8:33–4.14(c). The ALJ's decision in this respect is deemed a final agency decision, subject to appeal directly to this court. *N.J.A.C.* 8:33–4.14(c)3; *R.* 2:2–3(a)(2). The Commissioner reviews the application, whether forwarded by the SHPB or as directed by an ALJ, based on relevant statutory and regulatory criteria and determines whether or not to approve it. *N.J.S.A.* 26:2H–9; *N.J.A.C.* 8:33–4.15.

Finally, an applicant whose application is ultimately denied by the Commissioner may file an appeal with the Health Care Administration Board, created pursuant to *N.J.S.A.* 26:2H–4. This appeal will be heard by the OAL. *N.J.S.A.* 26:2H–9; *N.J.A.C.* 8:33–4.15(b). The Health Care Administration Board's decision to deny a CON is a final agency decision, subject to direct appeal to this court, *R.* 2:2–3(a)(2); *N.J.A.C.* 8:33–4.15(e), as is the Commissioner's decision to grant a CON to a competing applicant.

## II.

### *THE DEPARTMENT'S CALL AND THE COMPETING APPLICATIONS*

On December 6, 1993, the Department issued a call inviting the submission of CON applications for ventilator beds for adult patients. 25 *N.J.R.* 5704(b) (December 6, 1993). The call specifically noted that thirteen additional ventilator beds were needed in the region administered by LAB II, covering Hudson and Bergen Counties, the relevant geographic area involved in this appeal. In response to the call, Bergen Pines, a county-owned, 1185–bed teaching hospital located in Paramus, New Jersey, submitted an application to convert thirteen of its long-term care beds to thirteen ventilator beds. Bergen Pines proposed to locate the ventilator beds in its long-term care facility next to twelve ventilator beds for which Bergen Pines had applied and received a CON in 1989. At the time of the submission of the application, the previously approved CON for the twelve-bed ventilator unit had not been implemented due to incomplete negotiations with Medicaid. However, we were advised at oral argument that while this appeal was pending, the CON awarded to Bergen Pines for the twelve-bed unit was implemented. Bergen Pines envisioned the proposed twenty-five-bed unit as a subsection of the existing long-term care unit, serving ventilator-dependent patients who require a mechanical respiratory device in order to sustain their lives. Bergen Pines estimated the total project cost at $111,900, consisting of $72,900 for renovations and $39,000 for major movable equipment, and anticipated financing the project through available cash resources in the amount of $12,000 and a County of Bergen Bond Ordinance for $99,900.

The estimated cost of the project, $20.25 per square foot and $5,608 per bed, was calculated based upon the full twenty-five-bed unit Bergen Pines envisioned ultimately operating. Bergen Pines projected a loss of approximately $900,000 in each of the first two years of the operation of this ventilator bed unit. Following submission of answers to "completeness questions," Bergen Pines'

application was deemed complete and was forwarded to the LAB for the Hudson and Bergen County region (LAB II) for review.

The Harborage, which is adjacent to and affiliated with Palisades Medical Center (Palisades) in North Bergen, Hudson County, New Jersey, is a health care facility with 180 long-term care beds and sixty residential health care beds. The Harborage proposed to convert fourteen residential care beds to a separate dedicated unit of thirteen ventilator long-term care beds. Palisades had been experiencing difficulty in placing its ventilator-dependent patients in appropriate beds; thus, the application noted that if it were approved, Palisades would have a ventilator unit to which it could transfer those patients. The anticipated cost of The Harborage's proposed unit was $365,000, to be funded entirely through existing cash reserves. Excluding major moveable equipment of $250,000 and architect and engineer fees of $15,000, the project's cost was $100,000. The Harborage anticipated an operating profit of approximately $194,000 in the first year and $240,000 in the second year. After compliance with the "completeness questions," The Harborage's application was deemed complete and it was also forwarded to the LAB II for review.

In addition to the applications submitted by Bergen Pines and The Harborage, Englewood Nursing Center in Englewood, Bergen County, New Jersey and West Hudson Hospital in Kearny, Hudson County, New Jersey also submitted CON applications for the Commissioner's approval.

## III.

### THE LOCAL ADVISORY BOARD II'S REVIEW

The LAB II reviewed the applications submitted by The Harborage and Bergen Pines as well as the application of West Hudson Hospital at its meeting on June 9, 1994. The LAB II did not recommend approval of Bergen Pines' application, but because the application received affirmative votes from more than twenty-

five percent but less than fifty percent of the quorum of voting members, it was forwarded to the SHPB. In its rationale for its vote, the LAB II noted that there was a need for thirteen ventilator beds in the area, that the application substantially met the CON regulatory requirements, and that the project could be implemented in three months.

Bergen Pines' application did not address the availability of public transportation or supply documentation to show that the additional beds would improve the efficient operation of the facility by reducing the unit costs of care per patient. While noting that Bergen Pines had a current CON for twelve ventilator beds, which had been approved in 1989 but not yet implemented because of rate negotiations with Medicaid, the LAB II expressed concern that the service area was left with no operational ventilator beds. The LAB II also expressed concern with Bergen Pines' financial data, which indicated a projected financial loss of approximately $900,000 for each of the first two years of operation. The LAB II commented that it was unclear whether the funding for the project was to be obtained from a prior bond sale or whether it was to be included in a future bond sale by Bergen County. The LAB II ranked the Bergen Pines application third of the three applicants it forwarded to the SHPB.

With respect to The Harborage's application, the LAB II recommended it with more than fifty percent but less than 100% of its voting members expressing approval. The rationale for the LAB II's recommendation was that there was a need for thirteen ventilator beds in LAB II; the application was in substantial compliance with the regulatory criteria; the applicant had made a commitment to opening the unit regardless of the level of Medicaid reimbursement; the project could be operational within six months; The Harborage could provide access to ventilator beds in Hudson County where no ventilator beds were currently approved or available; and The Harborage's affiliation with Palisades enhanced the availability of acute care services for ventilator patients. The LAB II ranked The Harborage's application first

among the three applications that it forwarded to the SHPB. The LAB II ranked West Hudson Hospital's application second.

## IV.

### *THE STATE HEALTH PLANNING BOARD'S REVIEW*

On September 1, 1994, the SHPB met to consider the competing applications for ventilator beds in Region II submitted by Bergen Pines, The Harborage, and West Hudson Hospital. The Director of Health Planning Services for the Department and a LAB II representative discussed the relevant criteria for ventilator beds and the merits of the three applications. The SHPB discussed with the LAB II representative the current status of the Medicaid rate negotiations for ventilator beds, the uncertainty surrounding those negotiations, and the impact that they might have on whether the three applicants could implement their proposals if approved.

At the conclusion of the proceedings, the SHPB approved The Harborage's application not only because it was the best application presented but also because it was located in Hudson County, where there were not any ventilator beds currently extant. The SHPB denied Bergen Pines' application because (1) it had not implemented the 1989 CON; (2) it was not in Hudson County where the need was greatest; and (3) its application received the least support from LAB II. Additionally, the SHPB concluded that once The Harborage's application was approved, there would not be any further need for ventilator beds in the region. Bergen Pines was notified that its application would not be forwarded to the Commissioner for his consideration.

On September 29, 1994, Bergen Pines appealed the SHPB's decision not to forward its application to the Commissioner and moved for a partial summary decision based on the SHPB's failure to set forth in a written opinion the basis for its approval of The Harborage's application and the denial of Bergen Pines' application. The SHPB cross-moved for a partial summary decision,

arguing that there was sufficient documentation to support its decision. Concluding that the SHPB's failure to provide a written decision giving its explicit reasons for denying Bergen Pines' application was unreasonable, the Honorable Marie P. Simonelli, A.L.J., granted Bergen Pines' motion, and Bergen Pines' application, therefore, was forwarded to the Commissioner.

## V.

### THE DEPARTMENT LICENSURE SURVEY OF BERGEN PINES

On February 3, 1995, before Bergen Pines' CON application was reviewed by the OAL, a licensure survey was conducted at Bergen Pines by the Department staff. Five Federal Level A (the most serious) licensure deficiencies were uncovered. As a result, admissions to Bergen Pines were curtailed on February 8, 1995. The facility was surveyed again on February 24, 1995, at which time several more deficiencies were noted. As a result, Bergen Pines was fined $11,000. On August 9, 1995, Bergen Pines filed an appeal and the matter was transmitted to the OAL as a contested case. That appeal is still pending.

## VI.

### THE DEPUTY COMMISSIONER'S DETERMINATION

On August 14, 1995, after reviewing both applications, the Deputy Commissioner granted the CON application of The Harborage to convert fourteen of its residential health care beds into a thirteen-bed unit for long-term ventilator care and denied Bergen Pines' application to convert thirteen long-term care beds into thirteen ventilator beds for a total complement of twenty-five adult long-term care beds.[3] The Deputy Commissioner analyzed

---

[3] The decision was rendered by the Deputy Commissioner because the Commissioner had previously served as general counsel for the trade association

the statutory and regulatory criteria which guided the decision-making process. The Deputy Commissioner acknowledged that the cornerstone of *N.J.S.A.* 26:2H–8 is the requirement that the proposed service be necessary to provide health care in the area. Application of the methodology set forth in *N.J.A.C.* 8:33H–1.7(d) yielded a projected need for thirteen additional adult long-term ventilator care beds in LAB II. Having established the need for ventilator beds, the Deputy Commissioner turned to a consideration of the requirements of *N.J.S.A.* 26:2H–8.

*N.J.S.A.* 26:2H–8(a) required the consideration of facilities which may serve as alternates or substitutes for the service in question. The Deputy Commissioner noted that with the exception of Bergen Pines, which had previously received CON approval for twelve ventilators, there were no existing facilities in the region which could fulfill this function. The need for this specialized service having been determined by application of the need methodology, the Deputy Commissioner concluded that *N.J.S.A.* 26:2H–8(b), which required her review of the need for special services and equipment, had been met. Because each applicant proposed a ventilator bed care unit within an independent health care facility, the Deputy Commissioner acknowledged that *N.J.S.A.* 26:2H–8(c), mandating consideration of the possible economics and improvement in services to be anticipated from the operation of a joint central service, played no part in her deliberations.

*N.J.S.A.* 26:2H–8(d) required that the Deputy Commissioner consider the adequacy of financial resources and sources of present and future revenue. The Deputy Commissioner noted that The Harborage proposed to underwrite its total project cost with available cash equity and that the financial analysis made by Departmental staff had indicated adequate resources and sources of present and future revenue. In contrast, the Deputy Commis-

representing long-term care providers and had recused himself from all CON decisions regarding members of that association.

sioner concluded that Bergen Pines proposed to underwrite its project from available cash and from the proceeds of a Bergen County bond ordinance, and that Bergen Pines had projected a loss of over $900,000 for each of its first two years of operation. This information led the Department staff and ultimately the Deputy Commissioner to conclude that Bergen Pines failed to demonstrate adequate sources of present and future revenues and that the Bergen Pines project was, therefore, not financially sound. The Deputy Commissioner also determined that there was sufficient professional staff available in the service area to satisfy the manpower consideration of *N.J.S.A.* 26:2H–8(e).

Other factors considered by the Deputy Commissioner under *N.J.S.A.* 26:2H–8(f) included the health planning regulations for long-term care facilities of *N.J.A.C.* 8:33H–1.1 *et seq.*, especially that of *N.J.A.C.* 8:33H–1.14(d), which mandates the denial of a CON by an applicant that has been cited for state licensing or federal certification deficiencies "for the period beginning 12 months preceding submission of the [CON] extending to the date the Commissioner issues a final decision," *N.J.A.C.* 8:33H–1.14(c). In this regard, the Deputy Commissioner noted that Bergen Pines had been cited for Federal Level A deficiencies in Resident Behavior, Quality of Care, and Administration during an annual survey at the facility on February 3, 1995. As a result of the cited deficiencies, the Department curtailed admissions to the facility from February 8, 1995, through April 11, 1995. Based on this event, the Deputy Commissioner denied Bergen Pines' CON application.

The Deputy Commissioner further concluded that even if she were not precluded from granting a CON to Bergen Pines by the terms of *N.J.A.C.* 8:33H–1.14(d), she would be compelled to favor The Harborage's CON application over that of Bergen Pines because it satisfied the regulatory criteria to a higher degree than did Bergen Pines. *N.J.A.C.* 8:33H–1.19(e) required that priority be given to those applications that meet the greatest number of criteria set forth in *N.J.A.C.* 8:33H–1.19(e)1–3. Although both

applicants had facilities that could accommodate growth (*N.J.A.C.* 8:33H–1.19(e)2) and both documented a commitment to fifty-five percent Medicaid occupancy (*N.J.A.C.* 8:33H–1.19(e)3), The Harborage, located in Hudson County where there were no licensed ventilator beds, better satisfied the geographic accessibility criterion of *N.J.A.C.* 8:33H–1.19(e)1. Consequently, the Deputy Commissioner granted The Harborage's CON application for thirteen adult long-term ventilator care beds and denied Bergen Pines' application. This appeal followed.

## VII.

### *THE BERGEN PINES APPEAL*

Bergen Pines seeks a reversal of the final administrative action of the Deputy Commissioner that granted The Harborage's CON application and denied its CON application, contending that (1) the Deputy Commissioner's findings and conclusions that it did not have adequate sources of present and future revenues to implement its thirteen-bed ventilator unit project while The Harborage did have such resources and that The Harborage met the geographic access criteria of *N.J.A.C.* 8:33H–1.19(e)1 better than it did were arbitrary, capricious, and unreasonable; (2) the Deputy Commissioner's reliance on the recommendations of the SHPB to deny its CON application was arbitrary, capricious, and unreasonable; (3) *N.J.A.C.* 8:33H–1.14(d) violates the due process protections of the United States and New Jersey Constitutions and, therefore, the Deputy Commissioner's reliance upon that regulation to deny its CON application was unlawful; and finally (4) *N.J.A.C.* 8:33H–1.14(d) exceeds the statutory authority granted the Commissioner under the Health Care Facility Planning Act. We disagree and affirm.

We are satisfied from our study of the record and the arguments presented that the final administrative action of the Deputy Commissioner that granted the application of The Harborage for thirteen adult long-term ventilator care beds at its facility in North Bergen, New Jersey and denied Bergen Pines' similar

application for thirteen beds at its facility in Paramus, New Jersey was not arbitrary, capricious, or unreasonable; does not lack sufficient support in the record; and does not violate legislative policies expressed or fairly implied in the statutory scheme administered by the Deputy Commissioner. *See Henry v. Rahway State Prison,* 81 *N.J.* 571, 579–80, 410 *A.*2d 686 (1980); *Campbell v. Department of Civil Serv.,* 39 *N.J.* 556, 562, 189 *A.*2d 712 (1963); *In re Fiorillo Bros. of N.J., Inc.,* 242 *N.J.Super.* 667, 675–76, 577 *A.*2d 1316 (App.Div.), *certif. denied,* 122 *N.J.* 363, 585 *A.*2d 371 (1990); *In re Waste Disposal Agreement,* 237 *N.J.Super.* 516, 526–27, 528–29, 568 *A.*2d 547 (App.Div.1990). *See also Cliff v. Morris County Bd. of Social Servs.,* 197 *N.J.Super.* 307, 312, 484 *A.*2d 1275 (App.Div.1984), *rev'd on other grounds,* 101 *N.J.* 251, 501 *A.*2d 923 (1985); *Department of the Pub. Advocate v. Board of Pub. Utils.,* 189 *N.J.Super.* 491, 499, 460 *A.*2d 1057 (App.Div.1983); *In re Boardwalk Regency Corp. for a Casino License,* 180 *N.J.Super.* 324, 333–35, 434 *A.*2d 1111 (App.Div.1981), *modified,* 90 *N.J.* 361, 447 *A.*2d 1335, *appeal dismissed sub nom. Perlman v. Attorney General of New Jersey,* 459 *U.S.* 1081, 103 *S.Ct.* 562, 74 *L.Ed.*2d 927 (1982). *See also R.* 2:11–3(e)(1)(D). Moreover, all of the issues of law raised are clearly without merit. *R.* 2:11–3(e)(1)(E).

Further, we emphasize that our role in reviewing the Board's findings and conclusions is to determine

"whether the findings made could reasonably have been reached on sufficient credible evidence present in the record," considering "the proofs as a whole," with due regard to the opportunity of the one who heard the witnesses to judge of their credibility … and … with due regard also to the agency's expertise where such expertise is a pertinent factor.

[*Mayflower Sec. Co. v. Bureau of Sec.,* 64 *N.J.* 85, 92–93, 312 *A.*2d 497 (1973) (quoting *Close v. Kordulak Bros.,* 44 *N.J.* 589, 599, 210 *A.*2d 753 (1965)).]

*See also In re Suspension of Heller,* 73 *N.J.* 292, 309, 374 *A.*2d 1191 (1977); *Jackson v. Concord Co.,* 54 *N.J.* 113, 117–18, 253 *A.*2d 793 (1969). We are satisfied that such evidence appears in the record.

■ Furthermore, it is not our function "to substitute [our] independent judgment for that of [an] administrative" agency, such as the Department, "where there may exist a difference of opinion concerning the evidential persuasiveness of the relevant [proofs]." *First Sav. & Loan Ass'n v. Howell*, 87 *N.J.Super.* 318, 321–22, 209 *A.2d* 343 (App.Div.1965), *certif. denied*, 49 *N.J.* 368, 230 *A.2d* 400 (1967). "As a reviewing court, we will not weigh the evidence, determine the credibility of witnesses, draw inferences and conclusions from the evidence, or resolve conflicts therein." *De Vitis v. New Jersey Racing Comm'n*, 202 *N.J.Super.* 484, 489– 90, 495 *A.2d* 457 (App.Div.), *certif. denied*, 102 *N.J.* 337, 508 *A.2d* 213 (1985). *See also In re Grossman*, 127 *N.J.Super.* 13, 23, 316 *A.2d* 39 (App.Div.), *certif. denied*, 65 *N.J.* 292, 321 *A.2d* 253 (1974).

■ Moreover, in a "complex area where the Legislature has delegated a great amount of discretion to the administrative experts, deference must be accorded to the administrative agen- cy's expertise and experience in its domain." *Riverside Gen. Hosp. v. New Jersey Hosp. Rate Setting Comm'n*, 98 *N.J.* 458, 469, 487 *A.2d* 714 (1985). Thus, we " 'place[ ] great weight on the interpretation of legislation by the administrative agency to whom its enforcement is entrusted.' " *Medical Soc'y v. New Jersey Dep't of Law & Pub. Safety*, 120 *N.J.* 18, 26, 575 *A.2d* 1348 (1990) (quoting *Peper v. Princeton Univ. Bd. of Trustees*, 77 *N.J.* 55, 69– 70, 389 *A.2d* 465 (1978)). *See also Smith v. Director, Div. of Taxation*, 108 *N.J.* 19, 25–26, 527 *A.2d* 843 (1987); *Metromedia, Inc. v. Director, Div. of Taxation*, 97 *N.J.* 313, 327, 478 *A.2d* 742 (1984); *In re Petition of Adamar, Inc.*, 222 *N.J.Super.* 464, 469– 70, 537 *A.2d* 704 (App.Div.1988). Additionally, "[d]elegation of authority to an administrative agency is construed liberally when the agency is concerned with the protection of the health and welfare of the public." *Barone v. Department of Human Servs.*, 210 *N.J.Super.* 276, 285, 509 *A.2d* 786 (App.Div.1986), *aff'd*, 107 *N.J.* 355, 526 *A.2d* 1055 (1987). *See also In re Guardianship Servs. Regulations*, 198 *N.J.Super.* 132, 143, 486 *A.2d* 888 (App. Div.1984), *modified*, 103 *N.J.* 619, 512 *A.2d* 453 (1986).

A strong presumption of reasonableness must be accorded the agency's exercise of its statutorily delegated duties. *City of Newark v. Natural Resource Council in Dep't of Envtl. Protection*, 82 *N.J.* 530, 539, 414 *A.*2d 1304, *cert. denied*, 449 *U.S.* 983, 101 *S.Ct.* 400, 66 *L.Ed.*2d 245 (1980). This presumption is even stronger when the agency has been delegated discretion to determine the technical and special procedures for its task. *Id.* at 540, 414 *A.*2d 1304. We must also give due regard to the agency's expertise where, as here, such expertise is a pertinent factor. *Riverside Gen. Hosp. v. New Jersey Hosp. Rate Setting Comm'n*, *supra*, 98 *N.J.* at 469, 487 *A.*2d 714. Further, when an agency is charged with enforcing a statute, its interpretation of that statute is entitled to substantial deference, and should "prevail provided it is not plainly unreasonable." *Merin v. Maglaki*, 126 *N.J.* 430, 436–37, 599 *A.*2d 1256 (1992) (citing *Metromedia, Inc. v. Director, Div. of Taxation*, *supra*, 97 *N.J.* at 327, 478 *A.*2d 742).

Against this backdrop, we are satisfied that the final administrative action of the Deputy Commissioner challenged on this appeal should be upheld. The Deputy Commissioner's denial of Bergen Pines' application was based on two regulatory provisions. *N.J.A.C.* 8:33H–1.14(d) mandates the rejection of an application submitted by an applicant who has been cited for Level A deficiencies in the areas of nursing, patient rights, patient assessment of care plan, dietary services, infection control and sanitation, or who has had its admissions temporarily suspended or curtailed as a result of these deficiencies. This factor alone constituted sufficient grounds to deny Bergen Pines' application.[4] However, the Deputy Commissioner further compared the two applicants on the prioritization criteria set forth at *N.J.A.C.* 8:33H–1.19(e) and determined that, even if Bergen Pines' application had not been denied under *N.J.A.C.* 8:33H–1.14(d), its location was not as advantageous for geographic accessibility as that of The Harbor-

---

[4] Although the Deputy Director did not refer to *N.J.A.C.* 8:33–4.10(e)4, this section of the Administrative Code also mandates the denial of the Bergen Pines CON application.

age and that, therefore, priority had to be given to The Harborage's application, which met all three prioritization criteria. Either of these reasons is sufficient to require affirmance of the Deputy Commissioner's decision.

With respect to the Deputy Commissioner's conclusion that The Harborage's application better met the geographic access criteria, *N.J.A.C.* 8:33H–1.19(e)1, in pertinent part, provides:

[P]riority shall be given to the approval of Certificate of Need applications for projects which are in compliance with all applicable requirements of this chapter and which meet the greatest number of the following criteria:

1. The facility will be centrally located in a geographically accessible location *which is conveniently reached by public and private transportation by residents of all parts of the LAB region.*

[Emphasis added.]

Further, *N.J.A.C.* 8:33H–1.18(b) requires that a CON application for long-term care beds "shall identify the proposed facility's access to public transportation. Where possible, each facility shall be located where access is easily obtained via low cost public transportation." Finally, *N.J.A.C.* 8:33–4.10(a)7 requires that a CON applicant, in general, must address in its application "[a]ccess to public or private transportation to the proposed project[.]"

The Deputy Commissioner favored The Harborage's application over Bergen Pines' application, reasoning in part:

[The Harborage] satisfies, to a greater degree, the regulatory requirements for the issuance of a certificate of need. *N.J.A.C.* 8:33H–1.19(e) requires that priority be given to approving applications for specialized long-term care projects that are in compliance with all applicable requirements of *N.J.A.C.* 8:33H and that meet the greatest number of criteria set forth at *N.J.A.C.* 8:33H–1.19(e)1–3. While both applicants have demonstrated compliance with *N.J.A.C.* 8:33H–1.9(e)2 and 3, [The Harborage's] application better meets the geographic access criterion of *N.J.A.C.* 8:33H–1.19(e)1. [The Harborage] has proposed the establishment of beds in Hudson County. Bergen Pines, on the other hand, proposes to expand the number of its certificate of need approved adult long-term ventilator care beds in Bergen County. Since there are no licensed or certificate of need approved adult long-term ventilator care beds in Hudson County, [The Harborage's] application would have to be given priority because such approval would result in the improved distribution of adult long-term ventilator care beds throughout the LAB II region, thereby advancing access to these important services.

The Harborage's application plainly met the geographic access criterion better than Bergen Pines' application. Bergen Pines' application referenced only the facility's access by private transportation, via various highways. There was no discussion in the application regarding access via public transportation. The Harborage's application, on the other hand, specifically referenced access via public transportation, as well as via highway. The failure of Bergen Pines to discuss the accessibility of its facility via public transportation was specifically noted by the LAB II reviewing the two competing applications.

■ Accessibility via public transportation to any facility is particularly important to the family and friends of ventilator bed patients who wish to visit those patients. The Harborage, located in the southeastern portion of Region II, is easily accessible to the residents of that region. More importantly, The Harborage is located in Hudson County, which has no ventilator beds. Bergen Pines is located in Bergen County, where it already has approval for a twelve-bed unit. In order to distribute ventilator beds throughout the region, the Deputy Commissioner properly concluded that The Harborage's application better met the geographic access criterion than did Bergen Pines' application. This decision is not arbitrary, capricious, or unreasonable and is supported by the record.

■ Similarly, the Deputy Commissioner's determination to deny Bergen Pines' application by virtue of the reason of Federal Level A deficiencies is not arbitrary, capricious or unreasonable and is supported by the record. The public policy of this State is to ensure that health care services provided in the State are of the highest quality. *N.J.S.A.* 26:2H–1. In furtherance of that policy, the Department promulgated *N.J.A.C.* 8:33H–1.14(d), which expressly provides:

A Certificate of Need submitted by an applicant who was cited for State licensing or Federal certification deficiencies during the period identified in (c) above, which presented a serious risk to the life, safety, or quality of care of the facility's patients or residents, shall be denied. A serious risk to life, safety, or quality of care of patients or residents includes, but is not limited to, deficiencies in State

licensure or Federal certification requirements in the area of nursing, patient rights, patient assessment of care plan, dietary services, infection control and sanitation, or pharmacy, resulting in:

    1.  An action by a State or Federal agency to curtail or temporarily suspend admissions to a facility; or

    2.  Issuance of two or more Federal Level A deficiencies in the areas identified above; or

    3.  Issuance of one or more Federal Level A deficiencies in the same area on two or more consecutive visits.

The record shows that in February 1995, during a licensure inspection of Bergen Pines, Department employees uncovered numerous deficiencies involving issues such as the physical, verbal, and sexual abuse of patients; inaccurate patient assessments; shortages of nursing staffing; poor physical environment; and a lack of staff training in fire and emergency procedures. Five of the deficiencies were found to be Federal Level A, and as a result, admissions to the facility were curtailed and an $11,000 penalty was assessed against Bergen Pines. While Bergen Pines has appealed the deficiency assessment and that appeal is still pending, the Deputy Commissioner's reliance on that deficiency determination did not deprive Bergen Pines of procedural or substantive due process.

The United States Constitution provides that no state shall deprive any person of "property" without due process of law. *U.S. Const.* amend. XIV, § 1. Likewise, the New Jersey Constitution considers the acquisition, possession, and protection of "property" a "natural and unalienable right," subject to due process protections. *N.J. Const.* art. I, ¶ 1. Due process is a flexible concept, and procedural protections will often depend on the particular circumstances of a case. *New Jersey State Parole Bd. v. Byrne*, 93 *N.J.* 192, 209, 460 *A.*2d 103 (1983). In this regard, we deem it important to repeat what was so clearly stated by our Supreme Court in *In re Request for Solid Waste Util. Customer Lists*, 106 *N.J.* 508, 520–21, 524 *A.*2d 386 (1987):

Due process does not always require an administrative agency to hold an evidentiary hearing before it goes about the business it was created to conduct. The power to supervise and investigate a regulated industry could be undermined if a regulator were required to provide the industry with the right to produce

witnesses and cross-examine staff members before the agency could act. *See In re Application of Waterfront Comm'n,* 32 *N.J.* 323, 334[, 160 *A.*2d 832] (1960). Even when required, a hearing need not be tantamount to a trial. K. Davis, *1982 Supplement to Administrative Law Treatise, supra,* § 13:0 at 235. Sometimes nothing more is required than notice and the opportunity to present reasons, either orally or in writing, why the proposed action should not be taken. *See id.* (citing *Goss v. Lopez,* 419 *U.S.* 565, 95 *S.Ct.* 729, 42 *L.Ed.*2d 725 (1975)). At other times, however, in addition to notice and the opportunity to be heard, due process may also require further procedural safeguards such as the opportunity to confront and cross-examine adverse witnesses, oral argument, presentation of evidence, and the right to retain an attorney. 2 K. Davis, *Administrative Law Treatise, supra,* § 10:6 at 326–27 (quoting *Goldberg v. Kelly,* 397 *U.S.* 254, 90 *S.Ct.* 1011, 25 *L.Ed.*2d 287 (1970)); *see Board of Educ. v. Cooperman,* [105 N.J. 587, 600, 523 A.2d 655] (1987).

In determining whether a statute or regulation violates due process, our Supreme Court has adopted the three-pronged analysis set forth by the United States Supreme Court in *Mathews v. Eldridge,* 424 *U.S.* 319, 335, 96 *S.Ct.* 893, 903, 47 *L.Ed.*2d 18, 33 (1976). *J.E. ex rel. G.E. v. State, Dep't of Human Servs.,* 131 *N.J.* 552, 566–67, 622 *A.*2d 227 (1993). The *Mathews* three-prong analysis requires consideration of

(1) the private interest at stake; (2) the risk of erroneous deprivation of that interest through the agency procedures used, and the probable value of additional or substitute procedural safeguards; and (3) the State's interest, including the fiscal and administrative burdens that the additional procedural safeguards would entail.

[*Ibid.*]

▮▮▮ Application of the *Mathews* analysis compels the conclusion that the challenged regulation did not violate Bergen Pines' constitutional due process rights. First, the private interest at stake is Bergen Pines' ability to obtain a CON for its proposed thirteen-bed unit in the current ventilator bed "batch." However, "[d]ue process does not require a hearing where an individual has a mere expectation in a property interest." *Valdes v. New Jersey State Bd. of Med. Examiners,* 205 *N.J.Super.* 398, 405, 501 *A.*2d 166 (App.Div.1985). Bergen Pines' CON application was denied and The Harborage's CON application approved, not only because of Bergen Pines' Federal Level A deficiencies, but also on the basis of geographical accessibility. Consequently, even if Bergen Pines had successfully appealed the deficiency violations before

the CON award was made, Bergen Pines would still not obtain the CON over The Harborage because of the access issue. In any event, there is no assurance that Bergen Pines will be successful in its licensure violations appeal, particularly given the repetitive and serious nature of those violations. Since Bergen Pines could, therefore, have no more than an expectation that it would receive the CON, this factor does not weigh heavily in Bergen Pines' favor.

Additionally, had the Deputy Commissioner waited until Bergen Pines' licensure hearing was held before she made her CON decision, this delay could have had serious implications for ventilator-dependent patients in Region II. There are no ventilator beds in Hudson County, and there is an established need for such additional beds throughout the Hudson–Bergen County region. This need would go unfulfilled for a substantial period of time if the Department had to await the results of Bergen Pines' licensure appeal, including a possible appeal to the Appellate Division and perhaps the Supreme Court. Therefore, the value of additional procedural safeguards, such as a delay in the CON award while the licensure appeal is resolved, had to be balanced against the immediate need for ventilator beds in Region II. That balance clearly was in favor of fulfilling the immediate need for ventilator beds by awarding the CON to The Harborage.

The third prong of the *Mathews* analysis requires a balancing of the State's interests and the public's interests against those interests sought to be protected by Bergen Pines. *New Brunswick Sav. Bank v. Markouski*, 123 *N.J.* 402, 421, 587 *A.*2d 1265 (1991). The State's and the public's interest in proceeding as the Deputy Commissioner did was substantial. The Department is responsible for ensuring that only health care services of the highest quality are provided in New Jersey. Clearly, then, the Department has an interest in ensuring that a facility with serious licensure violations is not awarded a CON to provide additional services. Bergen Pines was cited for several serious violations, Federal Level A deficiencies, which involved patient safety and

welfare, and pursuant to *N.J.A.C.* 8:39–2.8(b), admissions to the facility were curtailed. Further, several of the deficiencies were noted in both February 1995 inspections indicating that the violations continued even after admissions were curtailed on February 8, 1995. Consequently, the Deputy Commissioner could not properly hold her CON decision in abeyance pending a final resolution of Bergen Pines' appeal and require the residents of Region II, who are in need of ventilator bed assistance, to await, for a substantial period of time, the outcome of the Bergen Pines appeal.

█    Finally, we emphasize that substantive due process does not protect against all governmental actions that infringe on an individual's liberty interests or injure property rights. *Rivkin v. Dover Tp. Rent Leveling Bd.*, 143 *N.J.* 352, 366, 671 *A.*2d 567, *cert. denied,* —— *U.S.* ——, 117 *S.Ct.* 275, 136 *L.Ed.*2d 198 (1996). "Rather, [it] is reserved for the most egregious governmental abuses, ... abuses that 'shock the conscience or otherwise offend ... judicial notions of fairness....' " *Ibid.* (citation omitted). And, we must not lose sight of the fact that a presumption of validity attaches to every regulation which is within the authority delegated to the promulgating agency, *Medical Soc'y v. New Jersey Dep't of Law & Pub. Safety, supra,* 120 *N.J.* at 25, 575 *A.*2d 1348, as well as to statutes and this "presumption is particularly daunting when [the] statute [or regulation] attempts to protect the public health, safety or welfare." *In re C.V.S. Pharmacy Wayne,* 116 *N.J.* 490, 497, 561 *A.*2d 1160 (1989), *cert. denied,* 493 *U.S.* 1045, 110 *S.Ct.* 841, 107 *L.Ed.*2d 836 (1990). *See also In re American Reliance Ins. Co.,* 251 *N.J.Super.* 541, 549, 598 *A.*2d 1219 (App.Div.1991), *certif. denied,* 127 *N.J.* 556, 606 *A.*2d 369 (1992). The burden on a proponent of such a statute's invalidity is a heavy one. *Ibid.*

Substantive due process challenges to a statute or regulation are analyzed in essentially the same manner under both the federal and New Jersey Constitutions. Specifically, a state statute or regulation does not violate substantive due process rights if

it is "reasonably relate[d] to a legitimate legislative purpose and is not arbitrary or discriminatory." *In re "Plan for Orderly Withdrawal from New Jersey" of Twin City Fire Ins. Co.*, 129 *N.J.* 389, 406, 609 *A.*2d 1248 (1992), *cert. denied*, 506 *U.S.* 1086, 113 *S.Ct.* 1066, 122 *L.Ed.*2d 370 (1993). *See also Greenberg v. Kimmelman*, 99 *N.J.* 552, 563, 494 *A.*2d 294 (1985); *Uncle v. New Jersey Pinelands Comm'n*, 275 *N.J.Super.* 82, 87, 645 *A.*2d 788 (App.Div.1994). Thus, if a statute or regulation is not unreasonable, arbitrary, or capricious and the means selected by the Legislature bear a rational relation to the legislative purpose sought to be obtained, the statute or regulation will withstand due process scrutiny. *Joseph H. Reinfeld, Inc. v. Schieffelin & Co.*, 94 *N.J.* 400, 413, 466 *A.*2d 563 (1983); *Schmidt v. Board of Adjustment*, 9 *N.J.* 405, 414, 88 *A.*2d 607 (1952); *Uncle v. New Jersey Pinelands Comm'n, supra*, 275 *N.J.Super.* at 87, 645 *A.*2d 788.

In considering a due process challenge to a statute or regulation, the court should not decide on the wisdom or utility of the statute or regulation, nor should the court "substitute [its] social and economic beliefs for the judgment of legislative bodies ... who are elected to pass laws" or the agency to whom authority was delegated to implement such laws. *Ferguson v. Skrupa*, 372 *U.S.* 726, 730, 83 *S.Ct.* 1028, 1030, 10 *L.Ed.*2d 93, 97 (1963). *See also In re American Reliance Ins. Co., supra*, 251 *N.J.Super.* at 549, 598 *A.*2d 1219. Rather, the court should simply determine "whether the statute [or regulation] is rationally related to the public health, safety or welfare." *In re C.V.S. Pharmacy Wayne, supra*, 116 *N.J.* at 498, 561 *A.*2d 1160. Moreover, for a statute or regulation to be rationally related to a legislative goal, it need not be the best or the only method of achieving that goal nor need it be mathematically perfect to withstand due process scrutiny. *Ibid.; In re American Reliance Ins. Co., supra*, 251 *N.J.Super.* at 553–54, 598 *A.*2d 1219. Health care, like the insurance business, is strongly affected with the public interest; hence, it is properly subject to comprehensive regulation. *See N.J.S.A.* 26:2H–1; *In re "Plan for Orderly Withdrawal for New Jersey" of Twin City Fire Ins. Co., supra*, 129 *N.J.* at 407, 609 *A.*2d 1248.

■ Applying these firmly settled principles here, we have no hesitancy in concluding that a rational relationship exists between *N.J.A.C.* 8:33H–1.14(d) and a legitimate legislative policy. Specifically, one of the legislative purposes behind the Act is a recognition that the provision of high quality health care to the citizens of New Jersey is "of vital concern." *N.J.S.A.* 26:2H–1. Regulations adopted pursuant to *N.J.S.A.* 26:2H–5b similarly note that the provision of high quality health care services is vitally important to New Jersey citizens. *N.J.A.C.* 8:33–1.2(a). In order to ensure that that goal is met, the Commissioner is authorized to inquire into the operation of a health care facility and conduct periodic inspections with respect to, in part, "the fitness and adequacy" of the facility. *N.J.A.C.* 8:33–1.2(b). *N.J.A.C.* 8:33–4.10(e) also requires that a CON applicant demonstrate the ability to provide quality care and permits the Department to examine the licensure record of an applicant to ensure that no violations have occurred which would jeopardize patient safety and welfare.

By enacting *N.J.A.C.* 8:33H–1.14(d), the Department has attempted to ensure that only services of the highest quality are provided the citizens of the State of New Jersey pursuant to its statutory mandate. If a provider has demonstrated an inability to meet licensure standards to the detriment of its patients, that provider should not be permitted to expand the number or type of services it provides until its licensure problems are resolved. In sum, the administrative regulation challenged on this appeal is rationally related to the legislative goal, and we will not declare it unconstitutional.

Accordingly, the final administrative action under review is affirmed substantially for the reasons expressed by Deputy Commissioner Ziskin in her written opinion dated August 14, 1995.