**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1777-17T3

NEW JERSEY DEPARTMENT OF
ENVIRONMENTAL PROTECTION,

    Petitioner-Respondent,

v.

RADIATION DATA, INC.,

    Respondent-Appellant,

_____

Argued October 9, 2018 – Decided November 2, 2018

Before Judges Sabatino, Haas and Sumners.

On appeal from the New Jersey Department of Environmental Protection, Docket Nos. ECE 9903-10, ECE 9904-10, ECE 9905-10, ECE 9908-10, EER 8829-10, EER 8833-11, EER 1216-13, EER 15876-14, and EER 0798-15.

David J. Singer argued the cause for appellant (Vella, Singer and Associates, PC, attorneys; David J. Singer and Lisa M. Leili, of counsel and on the brief).

William R. Lamboy, Deputy Attorney General, argued the cause for respondent (Gurbir S. Grewal, Attorney General, attorney; Jason W. Rockwell, Assistant

Attorney General, of counsel; William R. Lamboy, on the brief).

PER CURIAM

Radiation Data, Inc. ("RDI") appeals from a November 1, 2017 final agency decision of the Commissioner of the Department of Environmental Protection ("DEP"), which found RDI liable for violating several DEP regulations that govern radon measurement and mitigation activities in New Jersey. RDI is the largest radon measurement business in the State. The Commissioner's final decision followed proceedings before two successive Administrative Law Judges ("ALJs").

On appeal, RDI principally argues the DEP Radon Section, which administers the State's radon program, is wrongfully imposing regulatory standards upon RDI without adopting those standards through a formal rulemaking process as prescribed by the Administrative Procedure Act ("APA"), N.J.S.A. 52:14B-1 to -15.

Among other things, RDI contends the DEP has deviated in recent years from the text and original stated intent of the radon measurement regulations. RDI asserts the DEP has done so by: (1) deeming RDI responsible for approximately 450 so-called "affiliate" technicians in the field whom RDI does not employ, pay, or control; and (2) refusing to hold accountable the home

inspection businesses and perhaps other companies who actually employ such field workers. RDI contends it is impossible, or at least infeasible, for it to adhere to the DEP's mandates, given its lack of effective control over the field workers as well as the constraints of market competition.

RDI further argues the DEP is impermissibly enforcing a "Guidance Document" concerning quality assurance and control plans as a mandatory rule, without undertaking necessary public notice and comment.

RDI asserts a wide range of other factual and legal arguments contesting the agency's findings of violations.

For the reasons that follow, we affirm the Commissioner's final agency decision in part, reverse and remand it in part, and urge the DEP to engage in appropriate prospective rulemaking in accordance with the APA and Metromedia, Inc. v. Dir., Division of Taxation, 97 N.J. 313, 329 (1984).[1]

I.

Our analysis of this appeal first requires a preliminary discussion of radon gas detection and mitigation, and the State's overall regulatory scheme.

---

[1] In a companion interlocutory appeal, A-0707-17, we issued an opinion today reversing a trial court's denial of qualified immunity to the DEP and its officials who have been named as defendants in a civil action brought by RDI alleging improper treatment. That matter is remanded to adjudicate the remaining claims in that case that are not predicated on alleged constitutional deprivations.

A.  Radon Background

Radon is a colorless, odorless, radioactive gas that derives from the natural breakdown of uranium in soils.  Radon gas can infiltrate homes and other buildings through their foundations and then accumulate.  It is recognized as the second leading cause of lung cancer.

No level of radon exposure is considered entirely safe.  The United States Environmental Protection Agency ("EPA") has set 4.0 picocuries per liter (pCi/l) as the "action level" for radon, meaning the level at which mitigation of the gas should be considered.  Radon tests are often conducted in connection with residential real estate sales, commonly as part of the home inspection process.

If necessary, mitigation systems can be installed to decrease the level of radon in a building.  This is typically done by drilling a hole in the building's foundation and installing a pipe, which, as one witness described it, is "extended either up through the house, through the attic and then through the roof or that pipe would be curved out on an outside wall . . . draw[ing] all of the gases that are underneath the slab and venting them to the outside."

B. Statutory and Regulatory Background

In order to ensure that radon testers "use procedures and equipment which would provide scientifically accurate results," the Legislature in 1986 enacted

the Radiation Protection Act (the "RPA" or the "Act"), N.J.S.A. 26:2D-1 to -89. See S. Energy and Env't Comm., Statement to S. 1797 (Mar. 6, 1986). The Act requires the DEP to "establish a program for the certification of persons who test for the presence of radon gas and radon progeny in buildings," and a certification program for "persons who mitigate, and safeguard buildings from, the presence of radon gas and radon progeny." N.J.S.A. 26:2D-70, -71.

The RPA forbids uncertified persons from testing for or mitigating radon gas unless they are performing testing or mitigation on a building they own or are performing a radon test without remuneration. N.J.S.A. 26:2D-72. The statute also requires certified persons to disclose the results of the tests performed to the DEP. N.J.S.A. 26:2D-74. The Act includes a confidentiality provision barring disclosure of the address or owner of a nonpublic building, with some exceptions, outside of the DEP, and the State Department of Health. N.J.S.A. 26:2D-73.[2]

Notably for this appeal, the Act authorizes the DEP to "adopt rules and regulations to implement the provisions of [the Act]." N.J.S.A. 26:2D-76. Persons performing radon testing or mitigation without the required

---

[2] Consistent with this confidentiality mandate, we have sealed the portions of the record identifying specific buildings tested for radon and the names of their owners.

A-1777-17T3

certifications or failing to report results to the DEP and keep them confidential are guilty of a crime of the third degree. N.J.S.A. 26:2D-77. The statute allows the DEP to levy penalties of up to $2,500 for each violation of provisions of the Act or any rule, regulation or order promulgated pursuant to the Act. N.J.S.A. 26:2D-13. The DEP can settle claims or penalties, or collect them "in a civil action by a summary proceeding under 'the penalty enforcement law.'" Ibid. (citing N.J.S.A. 2A:58-1 to -12).

Since the Act does not specify regulatory penalties, the present case only involves whether RDI is liable for violations of the regulations, and does not concern the amount of any penalties. If the violations are upheld, the DEP will need to pursue a penalty action in the trial court to collect any penalties.

The DEP promulgated regulations initially in 1990 governing the certification of persons for radon testing and mitigation pursuant to this statutory mandate. N.J.A.C. 7:28-27.1 to -27.35. See 22 N.J.R. 3516(a) (Nov. 19, 1990). The regulations have been periodically renewed, most recently in 2013. 45 N.J.R. 1400(a) (June 3, 2013). The regulations are structured so that persons[3] conducting radon testing must be approved by the DEP as either certified radon

---

[3] The regulations define "person" to include businesses as well as individuals. N.J.A.C. 7:28-27.2. In this opinion, "person" only refers to an individual.

measurement "specialists" or certified radon measurement "technicians." N.J.A.C. 7:28-27.9 to -27.14. Similarly, persons performing mitigations must be approved by the DEP as either certified radon mitigation specialists or a certified radon mitigation technicians. N.J.S.A. 7:28-27.15 to -27.20. Generally, specialist certification requires more education and is more difficult to obtain than technician certification. Compare N.J.A.C. 7:28-27.9 with N.J.A.C. 7:28-27.12. Certification as a specialist qualifies an individual as a technician. N.J.A.C. 7:28-27.9(b); -27.15(b). Specialists can perform additional functions which technicians cannot perform. See e.g., N.J.A.C. 7:28-27.5(a)(1), -27.7(d).

A company such as RDI offering both measurement and mitigation services must be approved by the DEP as a certified measurement business and as a certified mitigation business.[4] See N.J.A.C. 7:28-27.5, -27.7. Certified measurement and certified mitigation businesses are "responsible for any violation of the ACT committed by an employee in the scope of his or her

_____

[4] RDI is also a certified radon environmental laboratory. The DEP regulates laboratories under a different set of regulations. See N.J.A.C. 7:18-1.1 to -1.9. RDI asserts that some of the violations in this case involving the measurement business regulations concern the work of its laboratory, which it contends is not subject to those regulations.

employment. This responsibility shall be joint and several." N.J.A.C. 7:28-27.29 (emphasis added).

The DEP's Radon Section administers this regulatory system. The regulations require certified parties to remain in compliance with the Act and regulations set forth in N.J.A.C. 7:28-27.1 to -27.35. N.J.A.C. 7:28-27.3(b). Parties can appeal the DEP's certification denial, refusal to renew, or revocation by requesting an adjudicatory hearing. N.J.A.C. 7:28-27.27(a). For all of these certification categories, the business or person must reapply for certification annually. N.J.A.C. 7:28-27.22.

C. Radon Measurement Businesses, Specialists, and Technicians

A certified radon measurement business is a commercial business enterprise certified "to sell devices or test for radon and/or radon progeny." N.J.A.C. 7:28-27.2. In order to be certified, a measurement business must "maintain on staff or retain as a consultant a certified radon measurement specialist." N.J.A.C. 7:28-27.5(a). This specialist is charged, among other things, with directing the measurement activities of the business, and "shall sign and be responsible for the review, approval, and verification of the reports" on radon tests. N.J.A.C. 7:28-27.5(a)(1). The business must also at all times have a certified mitigation technician on staff. N.J.A.C. 7:28-27.5(i).

8

Certified radon measurement specialists are persons certified "to perform and/or evaluate radon and/or radon progeny measurements for a certified radon measurement business." N.J.A.C. 7:28-27.2 (emphasis added). In their application to the DEP for certification, specialists must include "[a] list of all certified radon measurement businesses for which the applicant will be a certified radon measurement specialist." N.J.A.C. 7:28-27.10(a)(7) (emphasis added). If specialists wish to function individually as a measurement business, they must be certified as one. N.J.A.C. 7:28-27.9(c).

By comparison, a certified measurement technician is a person certified "to perform radon and radon progeny measurement activities." N.J.A.C. 7:28-27.2 (emphasis added). Measurement technicians must also include "[a] list of all certified radon measurement businesses for which the applicant will be a certified measurement specialist" in his or her certification application. N.J.A.C. 7:28-27.13(a)(5). The responsibilities of a measurement technician are a subset of those of a specialist. See 22 N.J.R. at 3519.

Only certified radon measurement specialists or technicians may perform radon or radon progeny testing, unless an exception applies. See N.J.A.C. 7:28-27.3(a), -27.31. Moreover, only a certified measurement business can report the results of a radon or radon progeny test to property owners. See N.J.A.C. 7:28-

27.28 (b) (stating that measurement businesses "shall report test results for radon and radon progeny directly to the owner of the building and the [DEP]").

Measurement businesses are required to develop and adhere to a plan of quality assurance and quality control ("QA/QC plan") for each type of measurement equipment they use, so as to ensure reliability and validity of radon measurements. N.J.A.C. 7:28-27.5(c). The QA/QC plan must contain certain elements required in N.J.A.C. 7:28-27.33, must "be submitted and approved by the [DEP] and, at a minimum, include the requirements of the authorized measurement protocols."[5] N.J.A.C. 7:28-27.5(c).

A certified measurement business must also "develop and comply with a radiological safety plan [("RSP")] designed to keep each employee's exposure to radon and radon progeny as low as reasonably achievable." N.J.A.C. 7:28-27.5(d). The DEP reviews and approves these plans, and the plans must include the requirements set forth in N.J.A.C. 7:28-27.34. Ibid.

When applying to the DEP for certification, a measurement business must include, among other things: the types of radon measurement equipment for

_____

[5] The authorized measurement protocols are "the 'Interim Indoor Radon and Radon Decay Product Measurement Protocols', E.P.A. 520/1-86-04, amendments thereto, or its latest revision; and 'Interim Protocols for Screening and Follow-up Radon and Radon Decay Product Measurements', EPA 520/1-86-014-1; page 4 and 13, and 15." N.J.A.C. 7:28-27.2.

which it seeks certification; identification of certified radon measurement specialists and technicians "employed by the business as staff members or consultants to be utilized by the applicant"; and copies of the QA/QC plan, RSP, and forms used to report results to clients.  N.J.A.C. 7:28-27.6.  The yearly application for recertification requires submission of these materials, as well as additional information. N.J.A.C. 7:28-27.22(b).

Radon measurement businesses are subject to various reporting requirements specified in N.J.A.C. 7:28-27.28.  Such measurement businesses must also keep certain records for five years including: records of all tests performed and required reporting information for the tests, records of all instrument calibration and quality control, and copies of certifications for all measurement specialists and technicians "employed by the business."  N.J.A.C. 7:28-27.21(a).

In addition, radon measurement businesses are required to train their employees yearly, and must also train them when they are newly hired.  N.J.A.C. 7:28-27.34(a), (c).  The DEP may conduct inspections of certified businesses. N.J.A.C. 7:28-27.24.  Certified businesses must submit in writing to the DEP changes in information from their original application at least thirty days in advance of their use, and changes in certified personnel at least fourteen days in

11

advance of their use. N.J.A.C. 7:28-27.3(f). Certified businesses are responsible for reporting results of all measurement or mitigation activity to the DEP. N.J.A.C. 7:28-27.3(j).

D. Radon Mitigation Businesses, Specialists, and Technicians

The DEP has also established certification requirements for radon mitigation businesses, specialists, and technicians. N.J.A.C. 7:28-27.7 to -27.8, -27.15 to -27.20. A certified mitigation business is a business certified "to design and/or install systems in buildings to mitigate and safeguard against radon contamination." N.J.A.C. 7:28-27.2.

Such a business is required to have a mitigation specialist on staff or serving as a consultant. N.J.A.C. 7:28-27.7(a). The mitigation specialist "shall perform a visual inspection and diagnostic tests, as appropriate, prior to system installation to determine the appropriate mitigation system to be installed." N.J.A.C. 7:28-27.7(d). The specialist must document these observations and results. Ibid. A mitigation business "shall assure that radon mitigation system installations are performed under the direct supervision of a certified radon mitigation specialist or certified radon mitigation technician." N.J.A.C. 7:28-27.7(c).

A-1777-17T3

The business must also develop and follow a RSP. N.J.A.C. 7:28-27.7(i). The regulations detail minimum requirements for the safety plan. See N.J.A.C. 7:28-27.34.

Mitigation businesses are subject to reporting requirements set forth in N.J.A.C. 7:28-27.28. The businesses must maintain certain records for five years, including: records of all mitigation work performed; records of mitigation plans developed, utilized, and signed by a mitigation specialist; records of all instrument calibration; copies of all certification applications and all correspondence with the DEP; and a copy of each mitigation contract. N.J.A.C. 7:28-27.21(b).

E. RDI's Business and An Industry Overview

RDI was founded in 1986. Its principal place of business is in Skillman, New Jersey. RDI is certified by the DEP as, respectively, a radon measurement business, a radon mitigation business, and a radon measurement laboratory. According to its President, RDI is involved in more than half of the radon testing conducted in this State. Since 1987, RDI has processed more than one million radon tests. In addition, RDI is heavily involved in the radon mitigation business. DEP records apparently show that RDI installed 658 mitigation systems in this State in 2013 and another 627 in 2014.

According to its organizational chart included as an exhibit in the administrative record, RDI had, at that time, only five employees apparently involved in the radon measurement and mitigation aspects of the business: RDI's then President, a quality assurance and lab officer, two laboratory technicians, and a clerical staff member. RDI's current employees include RDI's current President, who is a certified radon measurement and mitigation specialist, and RDI's Director of Operations, who became certified as a measurement specialist in June of 2014 and as a mitigation specialist in September of 2014. At oral argument on the appeal, RDI's counsel was unable to specify exactly how many of its employees currently work in the laboratory. In any event, the record reflects that RDI only employs a small number of employees who take part in the radon measurement and mitigation aspects of its business.

F. "Affiliates"

As will be discussed, infra, within our legal analysis, RDI depends upon numerous certified measurement technicians who are either employed by other businesses or self-employed but who have been "affiliated" with RDI. According to the testimony of RDI's witnesses, the regulatory scheme originally contemplated that all businesses who employ radon measurement technicians would themselves need to obtain certification from the DEP. However, at some

14

unspecified point in time, the DEP began to allow individual certified measurement technicians "affiliate" with a certified radon measurement business without being employed by that certified entity. In the instance of RDI, such an affiliate relationship is documented by a form letter from RDI to the DEP's Radon Section, representing that the particular technician, identified by his or her certification number, is "affiliated" with RDI. The record contains several examples of such form letters.

According to RDI, an individual radon measurement technician is permitted to affiliate with more than one certified radon measurement businesses. The second ALJ found from the evidence there are "roughly 720 affiliated technicians in the radon measurement field." The second ALJ also found that "roughly 400" of those technicians are affiliated with RDI, and that RDI's next largest competitor has "around 200 affiliated technicians."

The proofs reflect that RDI does not employ the "affiliated" measurement technicians on its payroll. Nor is there evidence that RDI pays the affiliated technicians any money for their services. Instead, the affiliated measurement technicians appear to typically work for a home inspection company. The business or technician frequently purchases a measurement device from RDI. RDI apparently is also paid to conduct the laboratory testing or data analysis on

15

radon tests. These charges are typically paid by the property owner or contract purchaser of the building being tested, usually as part of a real estate transaction.

RDI contends that it does not control the technicians who leave the sampling devices in buildings, as it neither pays those persons wages nor any other form of compensation.[6] RDI asserts it does not supervise those individuals who, in some instances, are also affiliated with one or more of RDI's competitor measurement business.

RDI contends that it began "affiliating" with individual technicians only because the DEP ceased requiring their respective employers to be certified, and because the DEP has insisted on RDI accepting responsibility for the affiliates' work in the QA/QC criteria. According to RDI, as a result of the DEP's change in regulatory approach, there used to be about 300 certified radon measurement business in New Jersey, whereas there are now only about twenty-nine.

---

[6]  In a certification submitted before the administrative hearings, RDI's President, who is not an attorney, inaccurately alluded to the existence of "contractual relationships" between RDI and the affiliated technicians. However, in testimony at the hearings, another RDI witness clarified that the term "contractual relationships" was "a poor choice of words." According to that witness, there are no contracts between the affiliated home inspectors and RDI. The record shows that those individuals merely purchase test kits from RDI, and RDI analyzes the samples, or data, and produces the results.

G. Sampling Devices

This case involves four different kinds of devices used to measure radon levels: (1) continuous radon monitors ("CRMs"); (2) charcoal canisters; (3) electrets; and (4) Alpha Track devices. At the time of the administrative hearings, RDI processed tests conducted with CRMs and charcoal canisters. RDI had previously processed tests conducted with E-PERM brand electrets.

Most test results reported to the DEP are derived from the charcoal canisters. With regard to those canisters, RDI commonly sells them to home inspectors; the inspectors place the canisters in buildings, and send the samples, along with a customer data sheet, to RDI. RDI's laboratory then analyzes the tests. A measurement specialist at RDI verifies the test results and reports them to the client and the DEP.

With regard to CRMs and electrets, the home inspectors generally own their own instruments. They send the test data to RDI, whose measurement specialist then calculates and certifies the results and reports them to the client and the DEP.

H. RDI's QA/QC Plan

RDI has been subject to the same DEP-approved QA/QC plan since 2005, which includes the plans for each device it is certified to use. In particular, RDI

17

obtained the DEP's approval to use charcoal canisters, CRMs, and E-PERMS, pursuant to the plan.

RDI's QA/QC plan represents that the company's "affiliated measurement technicians are all licensed by [the State of New Jersey], and have received the standard two-day course, plus annual continuous education." The QA/QC plan further asserts the technicians' New Jersey licenses "are maintained up to date, or their affiliation is terminated." The plan also states that RDI "will maintain records of the current licenses status of all home inspectors for whom the company reports radon tests to [the] DEP," because "it is company and . . . [S]tate policy for home inspectors to be licensed and to operate as agents of licensed Radon Measurement Businesses." The plan certifies that RDI "will refuse to process any radon test kit submitted by a home inspector whose license has expired."

I. The Alleged Violations and the Administrative Proceedings

The DEP issued nine Administrative Orders and associated Notices of Prosecution ("AO/NOPs") to RDI between August 2009 and December 2014. They allege violations of various requirements for certified radon measurement businesses and mitigation businesses.

RDI appeals the following charges brought against them for:

<u>Measurement Violations</u>

- Selling radon measurement devices without the required certification.

- Allowing uncertified persons to test for radon/radon progeny.

- Failing to comply with various provisions of their QA/QC Plan including, calibration procedure violations, measurement procedure violations, and recordkeeping violations.

- Failing to keep records of the current license status for "affiliated" testers.

- Processing tests with incomplete and/or incorrect reports and data sheets, and reporting tests marked invalid to the DEP.

- Failing to submit all test results to the DEP.

<u>Mitigation Violations</u>

- Allowing uncertified persons to perform mitigation jobs, and allowing a mitigation technician, not specialist, to troubleshoot and make design alterations on a mitigation system.

- Allowing mitigation technicians, not specialists, to perform visual inspections for a possible mitigation system.

<u>General Violations</u>

- Failing to provide documentation on new employee and yearly training for affiliates.

The DEP issued the first six AO/NOPs between August 2009 and June 2010. RDI requested a hearing on the AO/NOPs and the DEP moved for

A-1777-17T3

summary decision. RDI was not represented by counsel at this stage of this proceeding.

On March 14, 2013, the first ALJ issued an order granting partial summary decision in favor of the DEP on all but two of the charged violations.

The DEP thereafter issued three more AO/NPs between February 2011 and December 2014. RDI requested a hearing on these three AO/NOPs. The matter was transferred to the Office of Administrative Law ("OAL") and consolidated with the initial six appeals. This consolidated case was reassigned to a different ALJ ("the second ALJ"). The second ALJ denied the DEP's request to sever the first six AO/NOPs and convert the first ALJ's partial summary decision into a final decision. The second ALJ also denied RDI's request[7] to reopen/reconsider the first ALJ's partial summary decision.

The second ALJ held seven non-consecutive days of hearings from October 2015 to February 2016. Ibid. The ALJ heard testimony from: a radiation physicist from the DEP's Radon Section; a research scientist (now deceased) from the DEP's Radon Section; and another research scientist who is

_____

[7] By this point, RDI was represented by counsel.

the supervisor of the DEP Radon Section. The second ALJ also heard testimony from RDI's President and its Director of Operations.[8]

After considering the testimony and other evidence, the second ALJ found that RDI violated the various provisions of the Act and regulations, as alleged by the DEP in the three AO/NOPs, with the exception of two allegations in the AO/NOP docketed at EER 07985-15, which the second ALJ dismissed. RDI then filed exceptions with the DEP Commissioner.

J. The Commissioner's Decision

In his ensuing November 2017 final agency decision, the Commissioner agreed with and adopted, with certain modifications, the findings and conclusions of both the first ALJ's partial summary decision and the second ALJ's post-hearing decision. The Commissioner's modifications primarily involved addressing discrete points that RDI had raised in its exceptions. Among other things, the Commissioner emphasized that RDI could not allow radon testers to affiliate with its business and reap the presumed benefits, while disclaiming "the responsibility inherent in that relationship."

---

[8] During the course of the hearing, the DEP withdrew several allegations.

K. RDI's Appeal

RDI raises several arguments on appeal. Most broadly, RDI asserts the Commissioner's decision is arbitrary and capricious. RDI contends the decision will harm the radon industry, is dangerous to public health, and is inimical to the goals of the RPA.

RDI argues the DEP engaged in improper rulemaking without following APA requirements. In particular, RDI alleges the DEP impermissibly changed its interpretation of the regulations from requiring all businesses offering radon testing services to obtain certification, to a contrary policy that now allows testers to simply affiliate with a certified measurement business, such as RDI. Many of the charged violations against RDI were related to radon tests conducted by such affiliates. According to RDI, the DEP held RDI liable for violations based on a mistaken interpretation that certain references in the regulations to "employees," "contractors," and "workers" include so-called "affiliates." RDI asserts that the DEP should have adopted this material change in regulatory responsibility through proper rulemaking procedures, in compliance with the APA.

Further, RDI maintains the DEP has improperly required radon measurement businesses, such as RDI, to include commitments in their QA/QC

plans that were not duly promulgated through rulemaking. Instead, those commitments allegedly have been extracted through an informal DEP "Guidance Document."

RDI additionally contends that some of the violations concern the work of its certified laboratory, which are outside of the alleged purview of the DEP's Radon Section.

Lastly, apart from these points, RDI disputes various individual violations and certain discrete findings of the ALJs and the Commissioner.

## II.

### A. Scope of Review

"The 'core value[] of judicial review of administrative action is the furtherance of accountability.'" In re Proposed Quest Acad. Charter Sch. of Montclair Founders Grp., 216 N.J. 370, 386 (2013) (alteration in original) (citations omitted). To assure such accountability, appellate courts are empowered to set aside the decisions of administrative agencies when they are shown to be "arbitrary, capricious, or unreasonable, or . . . lack[ing] in fair support in the record." In re Herrmann, 192 N.J. 19, 27-28 (2007) (citing Campbell v. Dep't of Civil Serv., 39 N.J. 556, 562 (1963)).

As we exercise this important function of judicial review, we recognize the "final determination of an administrative agency . . . is entitled to substantial deference." In re Eastwick Coll. LPN–to RN Bridge Program, 225 N.J. 533, 541 (2016). A "strong presumption of reasonableness must be accorded [to an] agency's exercise of its statutorily delegated duties." In re Certificate of Need Granted to the Harborage, 300 N.J. Super. 363, 380 (App. Div. 1997). "The burden of demonstrating that the agency's action was arbitrary, capricious or unreasonable rests upon the [party] challenging the administrative action." In re Arenas, 385 N.J. Super. 440, 443-44 (App. Div. 2006).

The heart of this appeal involves the DEP's application of the radon statute and regulations the agency has adopted to carry out the Legislature's objectives under the RPA. In that context, "'[a]n administrative agency's interpretation of statutes and regulations within its implementing and enforcing responsibility is ordinarily entitled to our deference.'" Wnuck v. N.J. Div. of Motor Vehicles, 337 N.J. Super. 52, 56 (App. Div. 2001) (alteration in original) (quoting In re Appeal by Progressive Cas. Ins. Co., 307 N.J. Super. 93, 102 (App. Div. 1997)). However, despite that general deference to the agency's interpretations, we are not bound by them. In re N.J.A.C. 7:1B-1.1 et seq., 431 N.J. Super 100, 114 (App. Div. 2013). Indeed, "[w]hile we must defer to the agency's expertise, we

need not surrender to it."  N.J. Chapter of Nat'l. Ass'n of Indus. and Office Parks v. N.J. Dep't of Envt'l Prot., 241 N.J. Super. 145, 165 (App. Div. 1990).  We therefore do not automatically accept an agency's interpretation of a statute or a regulation, and we review strictly legal questions de novo.  Bowser v. Bd. of Trs., Police & Fireman's Ret. Sys., 455 N.J. Super. 165, 170-71 (App. Div. 2018).

B.  The Metromedia/Rulemaking Issues

RDI fundamentally argues that the DEP is attempting, in this regulatory compliance case, to enforce rules against RDI without appropriately promulgating them through public notice and comment rulemaking as required by the APA.  First, RDI contends the DEP's expansive use of the term "affiliates" – a term that neither appears in the RPA nor in the text of the radon regulations – amounts to de facto rulemaking.  Further, RDI argues that the DEP has been enforcing a "Guidance Document" concerning QA/QC plans as a rule, without conducting proper rulemaking procedures.  In that regard, RDI contends it is not responsible for failing to adhere to its QA/QC plan because the DEP forced RDI to include in its plan components set forth in the informal Guidance Document not required by the regulations.

The APA generally requires state administrative agencies to adopt rules in accordance with the public notice and comment procedures prescribed by N.J.S.A. 52:14B-4(a). In re Highlands Master Plan, 421 N.J. Super. 614, 623-24, 630 (App. Div. 2011). These requirements likewise apply when a state agency "revises, rescinds, or replaces . . . any . . . existing rule." Ibid. (alteration in original) (quoting N.J.S.A. 52:14B-4.9). As we have already noted, in the RPA the Legislature expressly delegated to the DEP the authority and responsibility to adopt administrative rules to carry out the radon statutory scheme. See N.J.S.A. 26:2D-76.

In Metromedia Inc. v. Dir., Div. of Taxation, 97 N.J. 313, 329, 338 (1984), the Supreme Court held that an administrative agency must conduct formal rulemaking before imposing new standards upon the parties that it regulates. The Court determined six factors, which guide the analysis of whether such formal rulemaking is necessary:

> (1) [the decision] is intended to have wide coverage encompassing a large segment of the regulated or general public, rather than an individual or a narrow select group; (2) [it] is intended to be applied generally and uniformly to all similarly situated persons; (3) [it] is designed to operate only in future cases, that is, prospectively; (4) [it] prescribes a legal standard or directive that is not otherwise expressly provided by or clearly and obviously inferable from the enabling statutory authorization; (5) [it] reflects an

26

> administrative policy that (i) was not previously expressed in any official and explicit agency determination, adjudication or rule, or (ii) constitutes a material and significant change from a clear, past agency position on the identical subject matter; and (6) [it] reflects a decision on administrative regulatory policy in the nature of the interpretation of law or general policy.
>
> [Id. at 331-32.]

These factors, "either singly or in combination," determine whether agency action amounts to the promulgation of an administrative rule. Id. at 332.

As we now explain, both the DEP's imposition of liability upon RDI for the conduct of "affiliates," and certain mandates for QA/QC plans as set forth in a Guidance Document, meet these Metromedia criteria. Formal rulemaking as to these matters was required, but not performed.

1. "Affiliate" Liability

A core premise affecting many of the measurement violations the DEP cited against RDI is whether RDI is responsible for the licensure and conduct of "affiliate" technicians who perform sampling out in the field. The Act itself does not mention, in regards to the certification program, the term "affiliate," nor any arguable synonym of the term, such as "representative," or "agent."

As we have already noted, the statute does require the DEP to establish a program for the "certification of persons who test for the presence of radon gas

27

and its progeny in buildings," N.J.S.A. 26:2D-70, and also for the certification of "persons who mitigate, and safeguard buildings from, the presence of radon gas and radon progeny," N.J.S.A. 26:2D-71. The statute further declares that "no person who is not certified" shall perform such mitigation or testing on a building, unless he or she owns the building or is doing the work without remuneration. N.J.S.A. 26:2D-72. The Act does not delineate the employment or contractual status of such certified "persons," or expressly indicate they must be "affiliated" with a certified radon measurement or mitigation business.

As we also have already stated, the text of the DEP's lengthy regulations governing radon measurement and mitigation does not include the word "affiliate" at all or any cognate term in reference to certified persons and businesses. The regulations do say that sampling must be performed by either a certified radon measurement specialist or technician. N.J.A.C. 7:28-27.9 to -27.14. A company providing measurement services must be approved by the DEP as a certified measurement business. N.J.A.C. 7:29-27.5. As we have noted, the measurement business must "maintain on staff or retain as a consultant a certified radon measurement specialist," N.J.A.C. 7:28-27.5 (emphasis added), who must "sign and be responsible for the review, approval, and verification" of reports on radon tests. N.J.A.C. 7:28-27.5(a)(1). The

regulations do not define the term "consultant" or delineate what his or her business relationship must be to the certified measurement business. For instance, the regulations do not make clear whether the consultant, who is not "on staff," can be an independent contractor, agent, or representative of the certified measurement business.

With respect to liability for regulatory compliance, the regulations declare that certified measurement and mitigation businesses are

> responsible for any violation of the Act committed by <u>an employee in the scope of his or her employment</u>. This responsibility shall be joint and several.
>
> [N.J.A.C. 7:28-27.29 (emphasis added).]

By choosing to use the term "employee," rather than non-employee terminology such as "independent contractor," the regulations appear to contemplate the existence of an employment relationship between the technician in the field and the certified measurement business, which is possibly only involved in supplying the testing devices and in testing the submitted samples.

The term "scope of employment" is defined in the regulations as

> acts carried out which are so closely connected with what a servant <u>is employed</u> to do and so fairly and reasonably incidental to it that they may be regarded as methods, even though improper, of carrying out the objectives of the employment and furthering <u>the interest of the employer</u>.

29

[N.J.A.C. 7:28-27.2 (emphasis added).]

This definition lends further support to RDI's argument that the literal phrasing of the regulations limit the term "employee" to traditional employer/employee relationships.[9] In response to a comment at the time of the 1990 rulemaking about the scope of employment concept, the DEP stated, "[a]nything a professional does to accomplish a job for which he or she is certified or to further the interest of an employer are [sic] considered the scope of employment." 22 N.J.R. at 3519 (emphasis added). The agency response suggests a broad notion of the kinds of activities that a certified measurement technician or specialist may perform that are subject to compliance, but it does not clearly express that a certified measurement business can be vicariously liable for the licensure and conduct of professionals whom do not literally "employ."

As written, the regulations appear to contemplate that the certified radon technicians and specialists who gather samples in the field must be either

_____

[9] Because we conclude the regulations, as written, cover only the acts of employees of RDI and other certified measurement businesses, we need not discuss here the various legal tests that describe in other contexts the characteristics of an independent contractor, as opposed to an employee. See e.g., Basil v. Wolf, 193 N.J. 38, 62-63 (2007) (quoting Baldasarre v. Butler, 132 N.J. 278, 291 (1993)). It will suffice to note that the DEP does not argue and has not proven that the individual technicians who serve as "affiliates" are RDI's employees.

employed by a certified measurement business or, alternatively, be specialists who are self-employed and have certified business status. This key premise of the original regulatory scheme is substantiated by the DEP's November 1990 Response to a Comment submitted in reaction to the proposed regulations:

> Comment: If a business places charcoal canisters which they [sic] purchase from a certified laboratory and the laboratory sends the results directly to the customer, <u>the business placing the canister should be exempt from certification</u>.

> Response: <u>The certification process</u> enables the Department to regulate a business to ensure that all sampling and analysis requirements are being adhered to and <u>gives the Department legal authority to require the business to follow standard guidelines</u>. The Department will be unable to determine if only certified persons are placing devices or that only certified laboratories are being utilized <u>unless sampling businesses are monitored through certification. The Department finds no compelling reason to exempt businesses which only place devices from the certification process</u>.

> [22 N.J.R. at 3520 (emphasis added).]

This critically-relevant comment indicates that the regulations, as written and duly adopted, were designed so that home inspection companies which merely purchase radon tests, place them in buildings, and send the samples to a laboratory, still need to be certified as measurement businesses.

A-1777-17T3

Further support for RDI's position is revealed by the DEP's 1990 Response to a Comment raising concerns about small businesses and sole proprietors who place radon test equipment in buildings. See 22 N.J.R 3517 (Nov. 19, 1990) (responding to a Comment that "most radon businesses are two or three man operations, operated out of individual homes," the DEP stated, "Since all radon businesses will be subject to compliance with these rules, all businesses will be required to employ certified individuals. Some operator/owners of small radon businesses will qualify as certified individuals[.]").

The APA mandates that an administrative agency "shall consider fully all written and oral submissions respecting [a] proposed rule," N.J.S.A. 52:14B-4(a)(3), and prepare for the public a report containing the agency's response to the comments submitted. N.J.S.A. 52:14B-4(a)(4). The agency's responses must be meaningful, reasoned and supported. See Animal Prot. League of N.J. v. N.J. Dep't of Envtl. Prot., 423 N.J. Super. 549, 573-74 (App. Div. 2011). "The purpose of the APA rulemaking procedures is 'to give those affected by the proposed rule an opportunity to participate in the process, both to ensure fairness and also to inform regulators of consequences which they may not have anticipated.'" In re Provision of Basic Generation Serv. for Period Beginning June 1 2008, 205 N.J. 339, 349 (2011) (quoting In re Adoption of 2003 Low

Income Hous. Tax Credit Qualified Allocation Plan, 369 N.J. Super. 2, 43 (App. Div. 2004)).

Despite these published responses and the plain text of the regulations, the DEP's witnesses at the administrative hearing contended that it has been the agency's "long-standing practice" to treat non-employee "affiliates" of certified measurement businesses as falling within the scope of those entities' oversight obligations and, for whom those certified businesses are, in essence, vicariously liable. The record suggests that the DEP has not, at least in recent years, required home inspection firms and other companies who employ radon technicians and specialists to obtain certification from the agency as a certified measurement business. Perhaps the practical reason for this non-enforcement is the economic burden that certification places upon such businesses, such as keeping a certified specialist on staff or under contract as a consultant, the various record-keeping obligations, and so on.

The DEP argues that it has made a reasonable regulatory choice in seeking to hold certified measurement businesses accountable for the work of "affiliate" technicians, rather than requiring such field workers to be employed by a certified business. That approach may well be allowable under the broad

umbrella of the RPA.  But there are several critical legal flaws with the manner in which the DEP has implemented that approach.

First and foremost, the DEP has failed to undertake formal rulemaking, including public notice and comment, in compliance with the APA to codify its "affiliate" concept and announce to the regulated community and the public in a transparent manner exactly what persons and businesses will be expected to have which obligations.  The agency has done nothing formally to retract its published responses to the 1990 comments concerning the regulations.  As Metromedia and other case law instructs, an administrative agency must adhere to these APA requirements. 97 N.J. at 331-32, 338.  The absence of proper revised regulations addressing vicarious liability for affiliates is not a mere housekeeping chore.

We are persuaded that the balance of the Metromedia factors compel the conclusion that the DEP's "affiliate" approach requires rulemaking.  First, the DEP intends its "affiliate" requirements to have "wide coverage encompassing a large segment of the regulated or general public." 97 N.J. at 331.  The DEP's definition of "affiliate" affects all measurement businesses who report tests not conducted by their own employees, even though RDI is allegedly the only such business that the DEP has sanctioned on this basis.  Second, the DEP clearly intends to apply these "affiliate" responsibilities "generally and uniformly" to

similarly situated entities.  Ibid.  There is no indication that similarly-situated certified measurement business other than RDI would face different requirements.

Third, the affiliate concept amounts to "a legal standard or directive that is not otherwise expressly provided by or clearly and obviously inferable from the enabling statutory authorization."  Ibid.  To be sure, the RPA gives the DEP broad regulatory powers.  However, the regulations the DEP promulgated in 1980 and has periodically renewed, pursuant to that authority, do not clearly spell out a vicarious liability obligation with respect to the conduct of affiliates.

Fourth, while the second ALJ reasonably found DEP's interpretation of "affiliate" to be long-standing, there is no evidence that the DEP's interpretation of "affiliates" was "previously expressed in any official and explicit agency determination, adjudication or rule."  Ibid.  As the DEP's witnesses' testimony shows, the affiliate concept represents a post-rule adoption revised agency policy decision interpreting the meaning and application of regulations and therefore constitutes an interpretation of "law or general policy."  Id. at 331-32.

Lastly, although the DEP is attempting to apply the affiliate obligation retrospectively in this case to RDI as a basis for many claimed violations, the affiliate concept appears to have prospective force as well.  See Id. at 331.

In sum, the Radon Section's "affiliate" policy is not expressed or readily inferable from the text of the existing statutes, regulations, and the DEP's own Responses to Comments published in the New Jersey Register. As such, the standards have been impermissibly adopted by the DEP without appropriate rulemaking, in violation of Metromedia.

An additional reason for rejecting the DEP's attempt in this case to impose vicarious responsibility on RDI for the conduct of affiliates stems from what RDI contends is the impossibility or impracticability of RDI vouching for the services of individual technicians whom it does not employ, compensate, or contractually bind through written agreements documented in the record. "A regulation which in practice is illusory or impossible to comply with is arbitrary and oppressive and would violate due process." Group Health Ins. v. Howell, 43 N.J. 104, 112 (1964) (citations omitted). Comparably, the Supreme Court has also stated that "[s]tatutory provisions which are unworkable and impossible to comply with may be invalidated on the ground that they constitute a denial of substantive due process" and "[u]nworkable municipal ordinances may also be invalidated on the grounds that they are arbitrary and unreasonable." Brunetti v. New Milford, 68 N.J. 576, 599 (1975) (citations omitted).

A-1777-17T3

As RDI points out, some technicians may choose to affiliate with more than one certified measurement business. The regulations do not specify how those multiple businesses are to control the activities of such "multi-affiliated" field workers. Nor is it clear how the measurement businesses are to coordinate and exercise responsibility for the required training and re-certification of such persons. In effect, what the DEP appears to be doing, to some extent, is to delegate its own direct regulatory functions to a private entity as, in effect, a "junior regulator." That delegation of a regulatory responsibility is not permissible under the law. Absent statutory authority, agencies cannot delegate their regulatory responsibilities to private entities. See e.g., N.J. Soc. for Prevention of Cruelty to Animals v. N.J. Dep't of Agric., 196 N.J. 366, 400 (2008) (finding a Department of Agriculture regulation, in effect, impermissibly subdelegated its mandate to establish humane practices to entities that could be described as private interests); State v. Bd. of Health, 208 N.J. Super. 415, 416 (App. Div. 1986) (finding "[b]y its contract the Board [of Health] has sought to delegate its governmental responsibility to a private entity. Absent statutory authority, there can be no such delegation. 'This is especially true when the agency attempts to subdelegate to a private person or entity, since such person or entity is not subject to public accountability.'" (citations omitted)).

Apparently, the DEP envisions that private certified measurement businesses such as RDI will insist on its affiliates providing them with records documenting their status as certified technicians.[10] But that does not assure that such persons are actually doing their tasks correctly out in the field. It is not obvious how RDI, which pays the measurement technicians no money for their activities, would have the economic leverage to control the quality of their work. Hypothetically, RDI might "de-affiliate" with certain individual technicians upon learning they are not complying with regulatory standards. But, as RDI points out, doing so might not prevent such persons from affiliating instead with one of RDI's competitors. Likewise, RDI asserts that it cannot feasibly restrict its measurement reports to only samples collected by its own employers, because other competitors would utilize "affiliates" unless the DEP took regulatory action against those competitors as well. The Commissioner's final agency decision presumes RDI derives a commercial "benefit" from its use of affiliates, but it is not clear whether the DEP itself has adopted a regulatory approach that makes such reliance an economic necessity. We need not resolve these questions here, and they are best developed and resolved through a rulemaking

---

[10] According to RDI, the DEP keeps a database of certification status and used to inform RDI when an individual's certification lapsed and/or expired, but has ceased doing so.

process in which the practicalities can be explored in a public, comprehensive, and transparent fashion, and on remand (as we discuss infra) concerning RDI in particular.

The DEP argues that RDI cannot be surprised by its position concerning affiliates because such responsibilities are reflected in the QA/QC plans that RDI periodically has agreed to follow. Yet that begs the important question of whether the DEP has a sound legal basis in the statute and regulations to insist on those requirements in the first place. Absent proper rulemaking, the violations dependent on such requirements cannot stand.

## 2. The QA/QC Guidance Document

We turn to the DEP's attempt to enforce the terms of its QA/QC "Guidance Document," which was issued without public notice-and-comment. We conclude the Guidance Document likewise suffers, to some extent, from a Metromedia rulemaking infirmity.

The APA allows administrative agencies to issue "regulatory guidance document[s]" defined as "any policy memorandum or similar document used by a State agency to provide technical or regulatory assistance or direction to the regulated community to facilitate compliance with State or federal law or a rule adopted pursuant to [the APA]." N.J.S.A. 52:14B-3a(d). These guidance

documents cannot "(1) impose any new or additional requirements that are not included in the State or federal law or rule that the regulatory guidance document is intended to clarify or explain; or (2) be used by the State agency as a substitute for the State or federal law or rule for enforcement purposes." N.J.S.A. 52:14B-3a(c).

This court has invalidated agency guidance documents that have imposed obligations and standards beyond those expressed in duly-promulgated regulations. See, e.g., In re Adoption of Reg'l Affordable Hous. Dev. Program Guidelines, 418 N.J. Super. 387 (App. Div. 2011); In re N.J.A.C. 7:1B-1.1 et seq., 431 N.J. Super. 100. "[A]n agency determination must be considered an administrative rule when all or most of the relevant features of administrative rules are present and preponderate in favor of the rule-making process." Metromedia, 97 N.J. at 331.

By illustration, in In re Adoption of Regional Affordable Housing Development Program Guidelines, 418 N.J. Super. at 389, the Council on Affordable Housing ("COAH") adopted "guidelines" for the implementation of an amendment to the New Jersey Fair Housing Act. We concluded these guidelines "set forth specific standards and conditions for regional planning that

COAH will find acceptable in its administration of [the applicable statute]" and therefore constitute rules. Id. at 395.

We similarly invalidated DEP guidance documents in In re N.J.A.C. 7:1B-1.1 et seq., 431 N.J. Super. 100, relating to the "waiver" rules excusing certain regulatory compliance.[11] In doing so, we noted the invalidated guidance document "lists specific procedures and instructions that waiver applicants should follow to prove and satisfy each of the four bases for waivers[.]" Id. at 136. We held that all six of the Metromedia factors applied to these guidance documents and much of the DEP's website postings concerning the waiver rules. Id. at 137.

Here, the DEP's QA/QC Guidance Document plainly contains certain mandatory language. While some features of the Guidance Document merely restate the requirements of N.J.A.C. 7:28-27.33 and the authorized measurement protocols, other provisions add requirements not found in the regulations or set forth specific requirements where the regulations otherwise are broadly written. For example, the Guidance Document lists "[r]equired data tracking information

---

[11] We note that the parties agreed in the present case that the DEP waiver regulations, N.J.A.C. 7:1B-1.1 to -2.4, could not be beneficial to RDI since some of the violations pre-date those regulations and also due to the exemption for licensure and certification issues. See N.J.A.C. 7:1B-2.1(b)(9).

[that] . . . must be on all chain of custody forms and mail order information cards," including test location, client information, device model number, floor/location, and so on. The radon regulations, by contrast, merely require a "description of sample tracking/chain of custody procedures" including "names and duties of the detector custodians . . . data tracking information required to be entered . . . and . . . [s]amples of tracking forms." N.J.A.C. 7:28-27.33(a)(6). Further, the Guidance Document requires specific provisions on school testing, but the regulations for QA/QC Plans do not mention school testing at all. A DEP witness at the hearing testified that the DEP would not approve RDI's QA/QC plan without the school testing requirements. She candidly agreed that the DEP's guidance in this respect was "more of a directive."

The balance of Metromedia factors reflect that the Guidance Document is intended by the DEP to operate as an unpromulgated rule. See 97 N.J. at 331-32. First, the Guidance Document appears intended to apply to all certified measurement businesses. Id. at 331. The document states "[a]ll sections in this guidance document and the accompanying checklist must be included and discussed in your QA/QC Plan." (Emphasis added). Second, this language in the Guidance Document indicates its wide application as well as its intention "to be applied generally and uniformly to all similarly situated persons." Ibid.

Third, the Guidance Document appears intended to act prospectively to all certification and yearly recertification applications of certified measurement businesses. Ibid. Fourth, the Guidance Document prescribes requirements that, while potentially valid if enacted through rulemaking, are not "clearly and obviously inferable" from the RPA's grant of power to the DEP to create a system of certification of businesses and persons conducting radon testing. Ibid. The fifth Metromedia factor is not as clear in its application because, except for the school requirements, the Guidance Document is not flatly contrary to requirements expressed in the regulations. Ibid. Nevertheless, the Guidance Document goes beyond the regulations in the mandates it conveys.[12] Finally, the binding nature of the Guidance Document "reflects a decision on administrative regulatory policy in the nature of the interpretation of law or general policy." Id. at 331-32.

3. The Impact of the Agency's Metromedia Violations on This Case

Our legal determinations that DEP deviated from the APA and Metromedia by its failure to promulgate valid rules concerning its "affiliate liability" policy, and with respect to certain portions of its QA/QC Guidance

---

[12] We recognize certain portions of the Guidance Document appear to relate back to federal standards imposed by the EPA.

Document does not mean that all of the measurement-related violations found against RDI in this case must be vacated. Some of the violations are unaffected by the Metromedia issue. In particular, certain violations relating to RDI's measurement functions do not depend on vicarious liability for the licensure status or activities of "affiliate" technicians, and may well be within RDI's realistic ability to control through the work of its own employees. RDI should not, for example, be certifying to the DEP and property owners that radon results are accurate if it knows, or has sufficient reason to know, those results are flawed. Moreover, as we note, infra, some of the violations adjudicated in the administrative case have nothing to do with "affiliate" liability or the QA/QC plan, such as the violations concerning mitigation-related inspections, and the sale of alpha track testing devices.

As to the enumerated violations concerning RDI's QA/QC plan, we do not set them aside wholesale because of the Metromedia problems. Rather, a violation-by-violation analysis is necessary, tied to whether the specified QA/QC violation is reasonably based on a fair application of the express terms of a particular regulation rather than comprising a mandate founded upon the unpromulgated language of the Guidance Document.

Given the highly technical features of these subject matters, we are not in the best position to perform a comprehensive violation-specific assessment in the first instance. Although we recognize the considerable time and expense the agency and RDI have already incurred in this administrative litigation, and the efforts devoted by the two ALJs who presided over the lengthy hearings, we conclude it preferable for this matter to be remanded to the OAL for further proceedings in light of our Metromedia holdings.

As a predicate to the remand, and as an aid to the ALJ who will preside over the remand proceedings, we direct the DEP to make a proffer to RDI within forty-five days of this opinion as to which specific proven measurement violations the DEP believes are unaffected by our Metromedia nullification, and which ones are not. Indeed, at oral argument on appeal, the DEP's counsel acknowledged that certain violations would need to be set aside in the hypothetical event we were to conclude the agency's affiliate liability policy and QA/QC Guidance Document had infirmities under Metromedia. RDI shall respond to the DEP's proffer within thirty days, and the matter should then be promptly scheduled for a case management conference before an ALJ.

On remand, the ALJ shall have discretion to hear additional testimony germane to the issues, including: (1) the impact, if any, of our Metromedia ruling

45

on specific violations; and (2) RDI's contention that certain violations are founded upon a mistaken premise that it is possible and feasible for RDI to control the acts of third parties that may underlie the claimed violation. The ALJ on remand should also address in more detail RDI's arguments that certain alleged "measurement" violations instead supplant the separate regulations governing RDI's laboratory activities.

Upon completion of the ALJ's remanded findings, either party may file timely exemptions with the Commissioner and, thereafter, a new appeal may be filed with this court arising from the new final agency decision.

We further note that our decision to remand this matter does not require the OAL or the agency to reconsider credibility findings on factual matters already addressed by the second ALJ in her comprehensive written decision. We reject RDI's argument that those credibility findings on factual issues should be set aside. Those findings are entitled to our deference and are supported by substantial credible evidence in the record. See H.K. v. State, 184 N.J. 367, 384 (2005). They need not be revisited. Of course, any new relevant factual testimony adduced at the remand proceeding will need to be evaluated by the ALJ for its credibility and probative worth.

In sum, we hold the DEP's "affiliate" position is invalid under Metromedia, and that those portions of its QA/QC Guidance Document that are not expressed or fairly inferable from the published regulations are likewise not a proper basis for enforcement. We remand for a further violation-by-violation assessment in light of our ruling, as well as a more in-depth evaluation of RDI's contentions of impossibility and impracticability of performance relating to the activities of persons it does not employ, compensate, or control. More broadly, we also urge the DEP to engage in prospective rulemaking in compliance with the APA with respect to both its "affiliate" policy and QA/QC plans, so that the published regulations accurately set forth the applicable standards to the public and the regulated community.

## III.

Lastly, we address the findings of violations by RDI that do not concern its measurement functions, i.e., those involving radon mitigation and its sales of radon detection devices. Upon reviewing the extensive record developed concerning those particular violations, and the meticulous determinations of the ALJs as upheld by the Commissioner, we are satisfied those findings are amply supported by credible proof in the record and are neither arbitrary nor capricious. Applying our limited scope of appellate review, we affirm those findings,

substantially for the sound reasons expressed in the respective ALJ decisions and in the Commissioner's final decision. RDI's arguments seeking to set aside those determinations lack sufficient merit to warrant discussion here. R. 2:11-3(e)(1)(D) and (E). Nonetheless, we add a few brief comments.

We are persuaded by the proof of RDI's nine violations of N.J.A.C. 7:28-27.7(c), which requires certified radon mitigation businesses to "assure that radon mitigation system installations are performed under the direct supervision of a certified radon mitigation specialist or certified radon mitigation technician." We agree with the agency that the term "directly supervise," as expressed in the regulation, logically and reasonably requires the physical presence of a specialist or technician to oversee the installations. Requiring such physical presence is consistent with the overall objectives of public safety reflected in the RPA. The requirement is neither arbitrary nor capricious. In addition, we note and defer to the second ALJ's finding that RDI's contrary interpretation was advanced by a witness who the ALJ found less credible than the DEP's witnesses.

We likewise uphold the DEP's determination that RDI violated N.J.A.C. 7:28-27.7(d), which requires mitigation specialists to "perform a visual inspection and diagnostic tests, as appropriate, prior to system installation to

determine the appropriate mitigation system to be installed." The specialist also must document the observations and test results from these inspections. N.J.A.C. 7:28-27.7(d). The record shows that in, at least two instances, RDI permitted mitigation systems to be installed by a mitigation technician without "appropriate" visual inspection by a mitigation specialist. The agency has reasonably rejected RDI's asserted justification that the individual deployed to the buildings in question was merely acting as a "salesman," and was only gathering data for an off-site mitigation specialist to evaluate.

Although the regulations do envision a degree of discretion by the specialist in choosing what, if any, mitigation systems are "appropriate" for a particular building, see 22 N.J.R. at 3521, the agency acted within its regulatory prerogatives to disapprove of the manner in which RDI handled the cited situations. Likewise, we upheld the determination of the DEP and the second ALJ that RDI's use of "stock drawings" of mitigation systems was an unacceptable practice.

RDI was also appropriately held liable for having two uncertified persons conduct an initial on-site inspection of a mitigation project and install mitigation systems. This is a proven violation of N.J.A.C. 7:28-27.7(d) and -27.3(e), and supported by the evidence in the record.

Finally, we note the record adequately supports the findings of both ALJs and the agency with respect to RDI's multiple sales of "Alpha Track" testing systems without proper certification to sell those items. See N.J.A.C. 7:28-27.3(d). The agency reasonably rejected RDI's reliance upon an exemption that only applies to businesses such as hardware stores that, unlike RDI, are retail outlets not certified radon measurement businesses. See N.J.A.C. 7:28-27.31(a)(4). Given that RDI is, and holds itself out as, a certified radon measurement business, it is reasonable that customers would expect that RDI had certification and expertise in all of the products it sells, as contrasted with a mere retail store.

In sum, we affirm all of the non-measurement violations, which now may be the subject of a penalty enforcement action.

IV.

For all of the foregoing reasons, we affirm the DEP Commissioner's final agency decision in part and reverse and remand it in part for additional administrative proceedings. The DEP is also urged to engage in prospective rulemaking as mandated by the APA and Metromedia. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

50

A-1777-17T3